**No. 24-1436**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

NUTRICIA NORTH AMERICA, INC.,
*Plaintiff-Appellant,*

v.

UNITED STATES,
*Defendant-Appellee,*

---

On Appeal from the United States Court of International Trade,
No. 1:16-cv-00008, Judge Timothy C. Stanceu

---

# CORRECTED OPENING BRIEF OF PLAINTIFF-APPELLANT NUTRICIA NORTH AMERICA, INC.

---

John Brew
Amanda Shafer Berman
Alexander H. Schaefer
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
jbrew@crowell.com

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1436

**Short Case Caption** Nutricia North America, Inc. v. US

**Filing Party/Entity** Nutricia North America, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/20/2024

Signature: /s/ John Brew

Name: John Brew

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Nutricia North America, Inc. | | Danone North America PBC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Alexander T. Rosen | Maria T. Vanikiotis | |
| Frances Pierson Hadfield | | |
| Hea Jin Koh | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for appellant is not aware of any other appeal in or from this action previously before this or any other appellate court. Counsel for plaintiff-appellant knows of no other case pending in this or any other court that will directly affect or be affected by this Court's decision in this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

STATEMENT OF RELATED CASES .......... iv

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

I. Factual background .......... 5

A. Medical Foods defined .......... 5

B. Nutricia's Medical Foods and the life-threatening diseases and disorders they treat. .......... 7

C. Use and characteristics of Nutricia's Medical Foods. .......... 9

1. MSUD Lophlex® LQ. .......... 10

2. Periflex® Infant and Periflex® Junior .......... 11

3. Neocate® Junior .......... 12

4. Ketocal® 4:1 Liquid. .......... 14

D. Marketing, prescription, and purchase of Medical Foods. .......... 15

E. Prior CBP rulings addressing Medical Foods .......... 19

II. Legal background. .......... 21

A. Interpreting the HTSUS. .......... 21

B. This case and the decision below. .......... 23

SUMMARY OF ARGUMENT .......... 25

STANDARDS OF REVIEW ........................................................ 27

I. The standard for review for tariff classifications ........................ 27

II. The standard of review on appeal. ........................................ 28

ARGUMENT ......................................................................... 29

I. The text of heading 3004 covers Medical Foods prescribed to treat life-threatening diseases in young children. ........................................................ 29

A. Medical Foods are "medicaments consisting of mixed products for therapeutic uses." ................ 29

B. Medical Foods are *prima facie* classifiable under heading 3004 because they are principally used to treat diseases. ........................................ 35

1. Medical Foods are used as medicaments. .................. 37

2. Medical Foods have physical characteristics similar to medicaments. ........................................ 38

3. Medical Foods are recognized in the trade as medicaments. ........................................ 39

4. Purchasers of Medical Foods have the same expectations as purchasers of medicaments. ............ 40

5. Given the high cost of medical foods, it is only practical to use them as medicaments. ............ 41

6. Medical Foods are sold in the same channels of trade as medicaments. ........................ 41

7. Medical Foods are sold in an environment similar to that of medicaments. ........................ 42

C. The CIT erred in finding that "medicaments" covered by heading 3004 cannot also be nutritional. ........................................................ 43

II. Note 1(a) to Chapter 30 does not apply to Medical Foods. .......... 52

A. Medical Foods are not of the same class or kind as diabetic, dietic or fortified foods or food supplements. .......... 52

B. Medical Foods are not *prima facie* classifiable in Section IV. .......... 57

III. The Medical Foods cannot be classified under heading 2106's residual basket provision. .......... 60

A. Note 1(f) to Chapter 21 excludes products that are prima facie classifiable under heading 3004. .......... 61

B. GRI 3(a) requires classification under heading 3004 because it is more specific than heading 2106. .......... 63

IV. The Medical Foods also are entitled to duty-free treatment under Subheading 9817.00.96. .......... 65

A. The Medical Foods are designed for use by handicapped children. .......... 66

B. The Medical Foods are not "therapeutic" under Subheading 9817.00.96 because they do not cure diseases they treat. .......... 69

CONCLUSION .......... 71

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. United States*,
964 F.3d 1087 (Fed. Cir. 2020) .......... 53

*Aramont USA, Inc. v. United States*,
671 F.3d 1310 (Fed. Cir. 2012) .......... 23, 36

*Bauer Nike Hockey USA, Inc. v. United States*,
393 F.3d 1246 (Fed. Cir. 2004) .......... 22, 62, 64

*BenQ Am. Corp. v. United States*,
646 F.3d 1371 (Fed. Cir. 2011) .......... 36

*Britt, Loeffler & Weil v. United States*,
7 Ct. Cust. 118 (1916) .......... 32

*CamelBak Prods., LLC v. United States*,
649 F.3d 1361 (Fed. Cir. 2011) .......... 22

*Carl Zeiss, Inc v. United States*,
195 F.3d 1375 (Fed. Cir. 1999) .......... 21, 22

*Colonial Press Intern Inc. v. US.*,
788 F.3d 1350 (Fed. Cir. 2015) .......... 30

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) .......... 30

*Dependable Packaging Sols., Inc. v. United States*,
757 F.3d 1374 (Fed. Cir. 2014) .......... 22

*Dodge & Olcott v. United States*,
130 F. 624 (1891) .......... 32

*Dupuch-Carron v. Secretary of Health and Human Services*,
969 F.3d 1318 (2020) .......... 59, 71

*E.M. Chems v. United States*,
920 F.2d 910 (Fed. Cir. 1990) .......................................................... 22, 30

*ENI Tech., Inc. v. U.S.*,
641 F. Supp. 2d 1337 (C.I.T. 2009) .......................................................... 57

*Franklin v. United States*,
289 F.3d 753 (Fed. Cir. 2002) .......................................... 23, 60, 63, 64

*Hewlett-Packard Co. v. United States*,
189 F.3d 1346 (Fed. Cir. 1999) .......................................................... 27

*Intercontinental Marble Corp. v. United States*,
381 F.3d 1169 (Fed. Cir. 2004) .......................................................... 33

*Jarvis Clark Co. v. United States*,
733 F.2d 873 (Fed. Cir. 1984) .......................................................... 27

*Keene Corp. v. United States*,
508 U.S. 200 (1993) .......................................................... 46

*LeMans Corp. v. United States*,
660 F.3d 1311 (Fed. Cir. 2011) .......................................................... 62, 64

*Len-Ron Mfg. Co. v. United States*,
118 F. Supp.2d 1266 (C.I.T. 2000) .......................................................... 23, 37

*Lonza, Inc. v. United States*,
46 F.3d 1098 (Fed. Cir. 1995) .......................................................... 33

*Magid Glove Safety Mfg. Co. v. United States*,
87 F.4th 1352 (Fed. Cir. 2023) .......................................................... *passim*

*McKesson & Robbins v. United States*,
3 Ct. Cust. 515 (1913) .......................................................... 32

*MetChem, Inc. v. United States*,
513 F.3d 1342 (Fed. Cir. 2008) .......................................................... 28

*Midwest of Cannon Falls, Inc. v. United States*,
122 F.3d 1423 (Fed. Cir. 1997) .......................................................... 49

*O'Neil v. Department of Housing and Urban Development*,
220 F.3d 1354 (2000) .......... 47

*Otter Prods., LLC v. United States*,
834 F.3d 1369 (Fed. Cir. 2016) .......... 28

*Patients Mut. Ass. Collective Corp., v. Comm'r of Internal Revenue*,
151 T.C. 176 (U.S. Tax Ct. 2018) .......... 30, 71

*Primal Lite v. United States*,
182 F.3d 1362 (Fed. Cir. 1999) .......... 36, 38

*R.T. Foods, Inc. v. United States*,
757 F.3d 1349 (Fed. Cir. 2014) .......... 60

*Richards Med. Co. v. United States*,
910 F.2d 828 (Fed. Cir. 1990) .......... 69

*Rooster Prods., Inc. v. United States*,
24 C.I.T. 357 (2000) .......... 28

*Rubie's Costume Co. v. United States*,
337 F.3d 1350 (Fed. Cir. 2003) .......... 23, 30, 51

*Sharp Microelectronics Tech., Inc. v. United States*,
122 F.3d 1446 (Fed. Cir. 1997) .......... 21, 45

*Sigvaris, Inc. v. U.S.*,
227 F.Supp.3d 1327 (Ct. Int'l Trade 2017), *aff'd* 899 F.3d 1308 (Fed. Cir. 2018) .......... 70

*Simod Am. Corp. v. United States*,
872 F.2d 1572 (Fed. Cir. 1989) .......... 30

*Sports Graphics, Inc. v. United States*,
24 F.3d 1390 (Fed. Cir. 1994) .......... 53

*Starkey Labs. v. United States*,
6 F.Supp.2d 910 (C.I.T. 1998) .......... 68

*Stewart-Warner Corp. v. United States*,
748 F.2d 663 (Fed Cir. 1984) .......... 27

*United States v. Alltransport, Inc.*,
44 C.C.P.A. 149 (1957) .......... 32

*United States. v. Carborundum Co.*,
536 F.2d 373 (C.C.P.A. 1976) .......... 23, 36, 37, 43

*United States v. Hillier's Son Co.*,
14 Ct. Cust. App. 216 (1926) .......... 32

*United States v. Wm. Cooper & Nephews, Inc.*,
22 C.C.P.A. 31 (1935) .......... 32

*Universal Elecs., Inc. v. United States*,
112 F.3d 488,492 (Fed. Cir. 1997) .......... 28

*Warner-Lambert Company v. United States*,
28 C.I.T. 939, 341 F.Supp.2d 1272 (2004), *aff'd*, 425 F.3d 1381 (Fed. Cir. 2005) .......... *passim*

**Statutes**

19 U.S.C. §3004(c)(1) .......... 21

21 U.S.C. §321(g)(1)(B) .......... 5

21 U.S.C. §343(q)(5)(A)(iv) .......... 6

21 U.S.C. §343(r)(5)(A) .......... 6

21 U.S.C. §360ee(b)(3) .......... *passim*

42 U.S.C. §1395ww(t)(4) .......... 18

42 U.S.C. §12101 *et seq*. .......... 9

42 U.S.C. §12102(1)(A) .......... 66

96 Stat. 2329 (1983) .......... 68

**Regulations**

21 C.F.R. §101.9(j)(8) ........ *passim*

21 C.F.R. §101.9(j)(8)(i) ........ 39

21 C.F.R. §101.9(j)(8)(ii) ........ 39

21 C.F.R. §101.9(j)(8)(b) ........ 37

61 Fed. Reg. 60661 (Nov. 29, 1996) ........ 5, 67

**Other Authorities**

S. Rep. No. 97-564 (1982) ........ 69

S. Rep. No. 97-564 (1982) ........ 70

## INTRODUCTION

Nutricia North American, Inc. (“Nutricia”) challenges U.S. Customs and Border Protection’s (“Customs”’) determination that manufactured substances prescribed by doctors to treat life-threatening diseases in young children (the “Medical Foods”) should be classified under the Harmonized Tariff Schedule of the United States (“HTSUS”) residual basket provision for “[f]ood preparations not elsewhere specified or included” (heading 2106).

Medical Foods, which it is undisputed are products for therapeutic use, should instead be classified as “medicaments … consisting of mixed or unmixed products for therapeutic . . . uses” (heading 3004), and also as items “for the use or benefit of” handicapped persons (subheading 9817.00.96). The result of Customs’ refusal to classify Medical Foods under those more specific—and prima facie applicable—headings is that parents of very ill children must pay higher prices for the Medical Foods due to substantial tariffs. The HTSUS can and should be interpreted to avoid that result, which Congress did not intend.

The CIT’s affirmation of Customs’ classification decision is based on several legal errors. <u>First</u>, the court bypassed the plain text of heading

3004, as well as over 100 years of appeals court precedent that confirms that substances with therapeutic uses like Medical Foods are medicaments *prima facie* classifiable under heading 3004. Instead, the CIT relied on an exclusionary note (Chapter 30, Note 1(a)) to redefine the terms of heading 3004, and wrongly hold that nutritional substances cannot be products of heading 3004 even if they are used to treat diseases.

Second, the CIT wrongly interpreted the same exclusionary note, which does not address medicaments or Medical Foods, to exclude what all agree are therapeutic products from classification under Chapter 30. Note 1(a) only addresses "dietetic," "diabetic," and supplemental food products *prima facie* classifiable under Section IV. Unlike Medical Foods, which are defined and regulated by Congress and the Food and Drug Administration ("FDA"), "dietetic," "diabetic," and supplemental food products are merely modifications of or additions to a normal diet. By law and under the undisputed facts here, Medical Foods are not modifications or additions to a normal diet. Rather, Medical Foods are used solely to treat, and often are the only treatment for, rare and incurable diseases in children. They mostly or fully replace a normal diet, and they are designed to be used under medical supervision.

Next, the CIT wrongly classified Medical Foods under heading 2106, a residual basket provision for "food preparations not elsewhere specified or included," even though that heading excludes products classified elsewhere and is far less specific than heading 3004.

Finally, the CIT also wrongly declined to apply subheading 9817.00.96, covering products designed for use by handicapped persons. Children with the diseases and disorders for which the Medical Foods are prescribed are disabled under the Americans with Disabilities Act ("ADA"), and Medical Foods are designed to ameliorate their conditions—which can be debilitating, interfering with daily activities. Given Congress's intent that this provision apply broadly, and that Medical Foods meet the terms of subheading 9817.00.96, the CIT's conclusion that this provision does not apply was error.

This Court should correct the CIT's and Customs' legal errors, reverse the decision below, and hold that Medical Foods are classified under heading 3004 and subheading 9817.0096.

## JURISDICTIONAL STATEMENT

The CIT properly exercised jurisdiction over this matter under Section 201 of the Customs Court Act of 1980, 29 U.S.C. §1581(a). This

Court has jurisdiction over Nutricia's appeal of the CIT's decision under 28 U.S.C. §1295(a)(5). Nutricia timely filed its notice of appeal. Appx39.

## STATEMENT OF ISSUES

1. Are Medical Foods, made of unique combinations of man-made amino acids and used to treat children with rare diseases, classified under HTSUS heading 3004, which covers "medicaments … consisting of mixed or unmixed products for therapeutic or prophylactic uses"? Or are Medical Foods instead classified under heading 2106, a residual basket provision for "food preparations not elsewhere specified or included"?

2. Does an exclusionary note to Chapter 30 that does not address medicaments or Medical Foods, but rather dietetic, diabetic, and supplemental foods, nonetheless redefine the terms of heading 3004 and exclude Medical Foods from that provision?

3. Are Medical Foods, which are designed to treat rare and incurable diseases in infants and children who are considered disabled under the ADA, secondarily classified under HTSUS subheading 9817.00.96, which provides duty-free treatment for articles designed for the use of handicapped persons?

## STATEMENT OF THE CASE

### I. Factual background

"[T]here is no genuine dispute as to the facts material to the classification of the products at issue." Appx5. A description of the Medical Foods and the diseases they treat nonetheless may inform the Court's assessment of how the HTSUS provisions should be interpreted.

#### A. Medical Foods defined.

Medical Foods are a special class of products defined by Congress and regulated by the FDA. Medical Foods meet the definition of "drugs" under the Food Drug Device and Cosmetic Act. *See* 21 U.S.C. §321(g)(1)(B) (defining "drug," in relevant part, as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals"). Historically, the FDA regulated Medical Foods like drugs, but the FDA determined that it needed to encourage production of Medical Foods and limit barriers to market entry. *See* Regulation of Medical Foods, 61 Fed. Reg. 60661, 60662 (Nov. 29, 1996). The FDA wanted to ensure that these products could be made readily available to patients at a reasonable cost, and concluded that the close monitoring of use by medical professionals would ameliorate any safety concerns. *Id.*

In 1988, Congress created a special definition for "medical foods" and exempted such products from the registration process that the statute imposed on other products that meet the definition of 'drugs,' and from the labeling and health claim requirements that the statute imposes on other products that meet the definition of foods. *See* 21 U.S.C. §360ee(b)(3) (defining "medical foods" as part of the Orphan Drug Amendments of 1988); 21 U.S.C. §343(q)(5)(A)(iv) (exempting medical foods from nutrition labeling, health claim, and nutrient content claim requirements applicable to foods); 21 U.S.C. §343(r)(5)(A) (providing medical foods an exemption from health claim requirements); 21 C.F.R. §101.9(j)(8) (exempting medical foods from labeling requirements and incorporating definition of "medical foods" into FDA regulations).

The FDA has instructed that Medical Foods must: (1) meet distinctive nutritional requirements of a disease or condition, (2) be used under medical supervision, and (3) be intended for the specific dietary management of a disease or condition. *See* 21 C.F.R. §101.9(j)(8).[1] FDA regulations further define a "medical food":

---

[1] *See also Guidance for Industry: Frequently Asked Questions About Medical Foods – Third Edition*, FDA (March 2023), https://www.fda.gov/media/97726/download.

> (i). It is a specially formulated and processed product (as opposed to a naturally occurring foodstuff used in its natural state) for the partial or exclusive feeding of a patient by means of oral intake or enteral feeding by tube . . . ;
>
> (ii). It is intended for the dietary management of a patient who, because of therapeutic or chronic medical needs, has limited or impaired capacity to ingest, digest, absorb, or metabolize ordinary foodstuffs or certain nutrients, or who has other special medically determined nutrient requirements, the dietary management of which cannot be achieved by the modification of the normal diet alone;
>
> (iii). It provides nutritional support specifically modified for the management of the unique nutrient needs that result from the specific disease or condition, as determined by medical evaluation;
>
> (iv). It is intended to be used under medical supervision; and
>
> (v). It is intended only for a patient receiving active and ongoing medical supervision . . . ..

21 C.F.R. §101.9(j)(8).

### B. Nutricia's Medical Foods and the life-threatening diseases and disorders they treat.

Foods need to be digested (i.e., broken down) into a usable form before they can be absorbed into the body, and by-products of the digestive process must be excreted to prevent a toxic buildup of waste. Appx174. Proteins are essential to the growth and function of all living organisms, and are comprised of varying sequences of twenty different amino acids. Appx175; Appx18. Humans source proteins by ingesting

plant or animal-based foods. Appx175. The body absorbs the amino acids into the blood stream, which deploys them to the organs and tissues where they are needed. Appx175-Appx176.

Some infants and children suffer from rare diseases and disorders that foreclose their ability to digest and process most or all naturally-occurring proteins. Appx176-Appx183. Whether the affliction is an inborn error of the metabolism (*e.g.*, an inherited DNA mutation), short gut syndrome (damaged/decreased intestines impairing amino acid absorption), intractable seizures, or an immune-mediated disease, these young patients face devastating consequences to their growth, and development. Appx176-Appx183.

Nutricia is a specialized medical nutrition company that designs and manufactures Medical Foods used to treat neurological diseases, metabolic disorders, and gastrointestinal disorders and diseases requiring nutritional therapy. Appx590. Nutricia does not produce or market conventional infant formulas. Appx590; Appx606; Appx632 at 79:12-24.

Nutricia's Medical Foods are designed, produced, marketed, prescribed by medical practitioners, and sold to treat infants and children

in order to reverse, stabilize, or mitigate these unique diseases and disorders where other medications, alteration of diet, and consumption of conventional foods are ineffective or impossible. Appx169; Appx171. Nutricia's Medical Foods often are the *only* treatment for affected children. Appx176; Appx35.

### C. Use and characteristics of Nutricia's Medical Foods.

The Parties have agreed that MSUD Lophlex® LQ, Periflex® Infant, Periflex® Junior, and Ketocal® Liquid are all used to treat persons with disabilities under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq*. *See* Appx4678-Appx4679 at ¶ 39.[2]

Before a patient uses a Medical Food, they generally undergo a comprehensive evaluation and a diagnosis by a licensed healthcare professional with specific training in both the disease and nutritional therapy. Appx172, Appx183.

The essential ingredients that make most of the Medical Foods[3] effective are specially produced amino acids that must be uniquely synthesized and combined with other ingredients to meet the medical

---

[2] Neocate® Junior is also used to treat a disability. Appx180-Appx181.

[3] Ketocal® Liquid, however, is effective due to a unique ratio of fats to proteins and carbohydrates. Appx187; pp.14-15 *infra*.

purpose. Appx184-Appx188. The input ingredients are manufactured by pharmaceutical suppliers, and the unique combinations of amino acids and/or other ingredients provide the essence of the Medical Foods, which target the unique biology of specific diseases. Appx184-Appx188. A short summary of each of the Medical Foods at issue and their uses follows.

### 1. MSUD Lophlex® LQ.

MSUD Lophlex® LQ is used as nutrition therapy for children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency (better known as "Maple Syrup Urine Disease" or "MSUD"), an inborn error of the metabolism. Appx5-Appx6. In this permanent and potentially lethal condition, children have impaired ability to metabolize essential amino acids. Appx176-Appx177. Because they cannot live without those amino acid, MSUD Lophlex® LQ is designed to include all the amino acids that the patient can metabolize without the amino acids that cannot be metabolized, thereby allowing the medical team to closely limit how much of the offending amino acids are consumed without compromising overall health from insufficient protein. Closely limiting ingestion of the offending amino acids so as not to trigger a toxic buildup,

but provide other amino acids sufficient to sustain life, thereby halts the disease in a way that naturally occurring proteins cannot. Appx177, Appx188-Appx189.

Children with MSUD who take MSUD Lophlex® LQ may lead otherwise healthy lives; that would not be the case with a normal or even an "avoidance" diet. Appx176-Appx177. In these children, the buildup of the relevant amino acids leucine may cause intractable vomiting, severe weakness (lethargy), seizures, and entry into a coma. Appx177.

**2. Periflex® Infant and Periflex® Junior.**

Periflex® Infant and Periflex® Junior are used to treat Phenylketonuria ("PKU"), which affects about 1 in 10,000 births. Appx177-Appx178; Appx669 at 1. PKU is an:

> [a]utosomal recessively-inherited inborn error of metabolism of phenylalanine characterized by deficiency of 1) phenylalanine hydroxylase caused by mutation in the phenylalanine hydroxylase gene (PAH) . . . The disorder . . . can produce brain damage resulting in severe mental retardation, often with seizures, other neurologic abnormalities such as retarded myelination and deficient melanin formation leading to hypopigmentation of the skin and eczema.

Appx4653-Appx4655. The prevailing treatment for PKU is a diet low in or devoid of the common amino acid phenylalanine coupled with the inclusion of certain supplements that provide the bare minimum amount

of phenylalanine required for synthesis of body proteins. Appx20; Appx177-Appx178, Appx185-Appx186; Appx190.

All newborns in the U.S. are tested for PKU within days of birth, because without treatment a child with PKU may suffer severe, irreversible brain damage, whereas children who are diagnosed early and maintain low levels of phenylalanine can lead normal lives." Appx190; Appx6. Periflex® Infant and Periflex® Junior are used to treat PKU in children under and over the age of one, respectively. Appx20; Appx190.

### 3. Neocate® Junior.

Neocate® Junior is used to treat patients who suffer from Short Bowel Syndrome ("SBS") and other diseases and disorders. Appx6, Appx23. SBS is a loss of intestinal surface for absorption of nutrients caused by the surgical removal of a section of bowel. Appx191. It may occur when those portions of the small intestine have been removed or are otherwise missing or damaged at birth. Appx191. SBS treatment may require parenteral nutrition (through a vein) to prevent malnutrition or enteral tube feeding in children who can tolerate the placement of food, fluids, and/or drugs directly into the stomach or small intestine through a tube inserted through the nose or directly through the abdomen into

the stomach (gastrostomy) or duodenum (duodenostomy). Appx179. Complications include vomiting, chronic diarrhea with fluid and electrolyte loss, enterocolitis and/or proctocolitis. Appx179. The condition also can cause small bowel bacterial overgrowth, altered functional motility, remnants of dysfunctional bowel, surgical diversion, or post-surgical anastomotic strictures (areas where ends of intestine were sewn together). Appx179. Finally, because the limited length of the small intestines of children with SBS makes for a smaller absorptive surface area, they may be unable to absorb nutrients for digestion during the limited time in which food is present in the small intestine. Appx178.

Neocate® Junior is used by children with SBS as nutritional therapy because it provides all of the essential amino acids in the appropriate proportions for maintaining bodily functions without having to undergo digestion prior to absorption within intestinal remnants. Appx192-Appx193. This allows the child to achieve maximal uptake of amino acids notwithstanding the limited surface area of the small bowel and the limited time available for absorption. Appx192-Appx193.

#### 4. Ketocal® 4:1 Liquid.

Ketocal® Liquid is used to treat patients who suffer from: Glucose Transporter Type 1 Deficiency (GLUT 1) and other diseases or disorders. Appx197-Appx200; Appx6-Appx7.

Glucose Transporter Type 1 deficiency (GLUT 1) is a lifelong metabolic disorder, resulting from a particular genetic mutation, which presents during infancy and is incurable. Appx197. Children with GLUT1 exhibit epilepsy, developmental delays, acquired microcephaly, cognitive impairment and varying degrees of spasticity, ataxia, and dystonia. Appx197; Appx7. Ketocal® 4:1 Liquid is designed for children ages 1-10 with intractable seizures and for whom multiple anti-seizure pharmaceuticals have been ineffective or insufficient. Appx187. It is designed for easy passage through a feeding tube since many children with intractable seizures are unable to swallow foods safely. Appx187.

Ketocal® is unique in that it provides a 4:1 ratio of fat calories to "non-fat" protein and carbohydrate calories; this induces a ketogenic state that has high efficacy in treating intractable seizures. Appx187. There is no naturally occurring food that can convey complete nutrition for a child in the way Ketocal® does, which is why this form of ketogenic

diet is popular among pediatric neurologists to treat patients with GLUT 1. Appx196-Appx197.

### D. Marketing, prescription, and purchase of Medical Foods.

Nutricia's Medical Foods are marketed to physicians like other medical products and well-known by those in the medical profession. Appx201. Doctors will provide samples of the Medical Foods to guardians of children with the disabilities described above and work with them to determine which Medical Food products the child can tolerate. Appx201. In that regard, these formulas are unlike applesauce or baby foods; rather, they are the culmination of decades of research in a small but important medical niche, and they represent state of the art nutritional therapy targeted to treat specific ailments. *See* Appx454-Appx564.

Advertising and marketing of Medical Foods takes place primarily at medical conferences and training sessions at healthcare facilities. Appx2701; Appx609. This is because it is the healthcare providers who then will prescribe or recommend the Medical Foods to the ultimate purchasers—the parents or guardians of a baby or child with a serious medical condition. Appx172, Appx183. These purchasers expect that Nutricia's Medical Foods will prevent or mitigate the symptoms their

children suffer, which would recur or worsen should the child be relegated to a conventional or avoidance diet. Appx183.

Once a child is diagnosed with one of the diseases that these Medical Foods can treat, a physician will prescribe or recommend the formula and then monitor growth, nutrition, toxicity, and general health. Appx183. The products' labels explicitly state the product should be taken under "medical supervision"; they also list the "indications" (meaning the diseases the product is designed to treat), and indicate that the products are used for the nutritional management of medical conditions. Appx2704; Appx 2638-Appx2667.

Medical Foods are expensive, but medical insurance will often cover some or all of the cost. Appx183. This typically requires a physician's prescription as well as follow-up by the physician with the insurance company to confirm the need for these products. Appx183, Appx2721.

Medical Foods are not products that a child's guardian would purchase without a directive from a medical provider—both because a prescription is usually required, and because the Medical Foods are far more costly than store-bought formula or baby food. Plaintiff's expert Dr. Pablo Robles conducted an analysis comparing the costs of the subject

Medical Foods with the costs of products in the baby food industry (i.e., store-bought formulas and baby foods) to determine whether these products are commercially fungible. Appx2689-Appx2690. Dr. Robles concluded that “the economic features of Nutricia's products are significantly different from those of the relevant comparator products, making it unlikely that consumers view the two sets of products as substitutes.” Appx2690. Dr. Robles found:

- Prices paid by consumers of the Medical Foods during the relevant period were significantly higher than the prices paid for products in the baby food industry. Appx2690.
- Medical Foods are often covered by insurance, and relevant comparator products in the baby food industry are not. Appx2690.

Dr. Robles also found that Medical Foods have significantly higher retail prices than baby food or formula purchased at a grocery store. Appx2710. In examining products sold in 2014, Robles found were that Medical Foods were up to 7.5 times more expensive than conventional baby food or formulas. Appx2709. Dr. Robles therefore concluded that it would make no economic sense for consumers of products in the baby food industry to consider the Medical Foods as potential substitutes. Appx2710. In addition, it could be dangerous for healthy children to consume medical foods. Appx189, Appx192.

State insurance mandates cover Medical Foods for certain conditions if a health professional indicates that they are medically necessary and prescribes the product. Appx2712. To obtain insurance reimbursement coverage for a product, the product must have a Healthcare Common Procedure Coding System (HCPCS) number. Appx175. HCPCS is a collection of standardized codes that represent medical procedures, supplies, products and services that the government categorizes as needed for the aged and disabled. *See* 42 U.S.C. §1395ww(t)(4). The codes are issued by the U.S. Government and used to facilitate the processing of health insurance claims by Medicare and other insurers. *See* 42 U.S.C. §1395ww(t)(4). Nutricia's products have HCPCS codes and qualify for private insurance reimbursement, and the insurance codes are listed inside Nutricia's materials (one of the HCPCS codes for Neocate®, for example, is B4161). Appx1733-Appx1762. Nutricia's records indicate that <u>at least 96%</u> of their sales are covered by some form of insurance or government support. Appx2712.

Nutricia's national medical sales teams sell to hospitals, home healthcare or durable medical equipment retailers,[4] and wholesalers. Appx4367 at 12:20-24. Medical Foods are also distributed directly to medical institutions including hospitals and clinics. Appx2714-Appx2719. Nutricia's largest customer is a medical surgical wholesaler, and the "largest sales channel in the medical food industry is the institutional sales channel, which accounted for 42.8% of sales in the medical food industry for the 2014-2020 period." Appx2700. Baby food, by contrast, is sold through traditional retailers such as grocery stores, pharmacies, and convenience stores. Appx2702.

### E. Prior CBP rulings addressing Medical Foods

In 1990, CBP issued a ruling classifying PKU products (*e.g.*, Analog XP or Maxamum XP) that are similar or identical to Periflex® products as medicaments under heading 3004. Appx4415-Appx4417, HQ 083000 (Sept. 19, 1990). But in 2004, CBP issued a ruling reclassifying PKU products as "[f]ood preparations not elsewhere specified or included" under heading 2106. Appx4424-Appx4428, HQ 966779 (Jan. 16, 2004).

[4] Durable medical equipment is "[e]quipment and supplies ordered by a health care provider for everyday or extended use." HealthCare.gov, https://www.healthcare.gov/glossary/durable-medical-quipment-dme/.

In 2007, CBP issued three rulings classifying other PKU products as medicaments under heading 3004. Appx4418-Appx4423, NY N005717 (Jan. 26, 2007), NY N006048 (Feb. 6, 2007), and NY N006049 (Feb. 6, 2007). In 2014, CBP revoked the three 2007 PKU rulings and reclassified those products to heading 2106. Appx4429-Appx4433, 48 Cus. Bul. & Dec. No. 35 (Sept. 3, 2014).

Later in 2014, CBP issued a ruling in response to Nutricia's protest challenging liquidation of 2009 entries of Medical Foods similar to those at issue here. Appx4434-Appx4445, HQ H121544 (Oct. 6, 2014). CBP rejected Nutricia's arguments that the products should be classified under heading 3004 as medicaments and secondarily classified under subheading 9817.00.96. CBP instead classified the Medical Foods as food preparations not classified elsewhere under heading 2106. Appx4434-Appx4445. CBP rejected classification of Medical Foods under heading 3004 because, contrary to its admission before the CIT here (Appx4859-Appx4916, Sec. IV.A), it found that Medical Foods were not for therapeutic uses, and rejected classification under subheading 9817.00.96 because it found that infants and children who use Medical Foods are not disabled. Appx4443-Appx4444.

## II. Legal background.

### A. Interpreting the HTSUS.

The provisions of the HTSUS are "statutory provisions of law for all purposes." 19 U.S.C. §3004(c)(1). The HTSUS must be interpreted consistently with the General Rules of Interpretation ("GRIs"), which "govern the proper classification of all merchandise" *Carl Zeiss, Inc v. United States,* 195 F.3d 1375, 1379 (Fed. Cir. 1999).

Under GRI 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1 first requires an examination of whether goods are *prima facie* classifiable under potentially applicable headings, and then whether there are any "relative" section or chapter notes that further inform classification. *See Magid Glove Safety Mfg. Co. v. United States*, 87 F.4th 1352, 1358 (Fed. Cir. 2023) (stating that "a proper classification analysis starts with the terms of the headings" and determining that the text of heading 6116 applied to imports before considering an exclusionary note); *Sharp Microelectronics Tech., Inc. v. United States*, 122 F.3d 1446, 1450 (Fed. Cir. 1997) (determining that Trade Court erred in "employing [a chapter exclusionary note] as an analytical tool before one first decides if an article is classifiable under the [proper] heading").

When a term used in a heading is not defined in the HTSUS or legislative history, the term's correct meaning is its "common and popular meaning." *E.M. Chems v. United States*, 920 F.2d 910, 913 (Fed. Cir. 1990). To determine a HTSUS term's common meaning, a court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Carl Zeiss*, 195 F.3d at 1379.

Under GRI 3(a), "[w]hen goods are *prima facie* classifiable under two or more headings," then "the heading which provides the most specific description shall be preferred to headings providing a more general description." *Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246, 1251-52 (Fed. Cir. 2004) (internal quotation omitted).

For headings that are "principal use provisions," which describe an article by their principal or "ordinary" use,[5] "Additional Rules of Interpretation" ("ARI") also apply. *Dependable Packaging Sols., Inc. v. United States*, 757 F.3d 1374, 1378 (Fed. Cir. 2014).

ARI 1(a) states:

> [A] tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States

---

[5] In contrast, "an eo nomine provision ... describes an article by a specific name." *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011).

> at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use.

To determine whether the imported product falls within the "class or kind" of goods in a tariff provision, the courts examine seven factors, called the "*Carborundum* factors." *See Aramont USA, Inc. v. United States,* 671 F.3d 1310, 1312-1316 (Fed. Cir. 2012); *Len-Ron Mfg. Co. v. United States,* 118 F. Supp.2d 1266, 1282 (C.I.T. 2000) (citing *United States. v. Carborundum Co.,* 536 F.2d 373, 377 (C.C.P.A. 1976)).

Finally, although they are not binding, the World Customs Organization's ("WCO's") Explanatory Notes ("ENs") may be used to "clarify the scope of the HTSUS subheadings and [ ] offer guidance in their interpretation." *Franklin v. United States*, 289 F.3d 753, 758 (Fed. Cir. 2002). However, the ENs cannot be used "to narrow the language of the classification of the heading" unless there is "a clear[ ] showing of congressional intent." *Rubie's Costume Co. v. United States,* 337 F.3d 1350, 1359 (Fed. Cir. 2003).

**B. This case and the decision below.**

Nutricia brought this case to challenge Customs' wrongful classification of four entries of the Medical Foods under heading 2106,

and Customs' subsequent denial of Nutricia's protests. Appx3. Nutricia appealed to the CIT. *See* Appx40-Appx52 (docket).

The parties cross-moved for summary judgment. Appx3. Nutricia argued that Customs' classification decision was wrong and the Medical Foods must be classified under two duty-free provisions (3004 and 9817.00.96). Appx3. The government argued that Customs' decision was correct, but for different reasons than provided by Customs. *Compare* Appx4434-Appx4445 *with* Appx4671-Appx4750. For example, Customs found that Medical Foods are not therapeutic, Appx4443, but the government took a different position below. *E.g.*, Appx4716, Appx4925.

The CIT found "there is no genuine dispute as to the facts material to the classification of the products at issue." Appx5. And the CIT admitted that "[i]t could be argued that the products under consideration are medicaments" as described in heading 3004. Appx12.

But the CIT then wrongly concluded that Customs' classification of Medical Foods under the heading 2106 residual basket provision for "food preparations, not elsewhere specified or included" was correct based on exclusionary note 1(a) to Chapter 30. Appx15-Appx16, Appx24. The CIT also wrongly opined, based on that exclusionary note, that to be a

"medicament" under heading 3004, a product may not be comprised of "nutritional" substances. Appx7-Appx26.

The CIT also refused to apply subheading 9817.00.96, covering "[a]rticles specially designed … for the use or benefit of … handicapped persons" to Medical Foods, opining that Nutricia's construction of "handicapped" and "physical or mental impairment" was "overly broad." Appx37-Appx38.

## SUMMARY OF ARGUMENT

1. The CIT erred as a matter of law when it relied on an exclusionary note to interpret HTSUS heading 3004 to not cover the Medical Foods, which fall squarely within the terms of that heading because they are "medicaments consisting of mixed or unmixed products for therapeutic … uses." There is no dispute that Medical Foods are made for the therapeutic use of treating young children with life-threatening diseases and disorders. The CIT's interpretation of "medicaments" to exclude such products is contrary to precedent, and its conclusion that medicaments (and all Chapter 30 goods) cannot be made of nutritional substances is unfounded. Had Congress wanted to so limit heading 3004, it would have done so explicitly.

2. The CIT also erred when it concluded that Note 1(a) to Chapter 30 describes Medical Foods, and thus prevents classification of these products in heading 3004. Medical Foods are not like the products listed in that note; they are not "dietetic" or "diabetic" foods, nor are they "food supplements," "tonics," or "mineral waters." Unlike those types of products, Medical Foods are prescribed or recommended by healthcare professionals, and are used under medical supervision when modification of a normal diet will not treat the disease. And Medical Foods are not *prima facie* classifiable under Section IV, as the text of Note 1(a) requires.

3. Even if Medical Foods were *prima facie* classifiable under heading 2106, they still must be classified under heading 3004 because Chapter 21, Note 1(f) excludes products that are *prima facie* classifiable under heading 3004. And under GRI 3(a), if a product is classifiable under two headings, then the most specific heading prevails.

4. Finally, the Medical Foods are also entitled to tariff-free treatment under subheading 9817.00.96, which was intended by Congress to apply broadly to products designed for use by handicapped persons—including children suffering from the debilitating diseases that the Medical Foods treat, who qualify as "disabled" under the ADA.

## STANDARDS OF REVIEW

### I. The standard for review for tariff classifications.

The determination of the proper customs classification of goods is a two-step process: (1) ascertaining the meaning and scope of specific terms in the HTSUS provision at issue; and (2) determining whether the merchandise comes within the description of those terms. *Hewlett-Packard Co. v. United States,* 189 F.3d 1346, 1348 (Fed. Cir. 1999). The first step is a question of law which this Court reviews *de novo*, while the second is a question of fact, reviewed for clear error. *Stewart-Warner Corp. v. United States*, 748 F.2d 663, 664-665 (Fed Cir. 1984).

Only the first step is in play here, where the question on appeal is the proper interpretation of HTSUS heading 3004 and subheading 9817.00.96. Because there are no factual disputes regarding the nature or use of the merchandise, but rather only legal disputes as to the proper meaning of HTSUS terms, the classification issue must be resolved as a matter of law. *Magid Glove*, 87 F.4th at 1357.

When determining which of two competing interpretations of the HTSUS is correct, Customs is not entitled to deference. Rather, the court must determine "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis*

*Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984). Contrary to the CIT's suggestion (Appx8), Customs is only afforded a presumption of correctness where there is a factual dispute. *See Rooster Prods., Inc. v. United States,* 24 C.I.T. 357, 358 (2000) (citing *Universal Elecs., Inc. v. United States,* 112 F.3d 488,492 (Fed. Cir. 1997)). Where the proper classification of the goods turns on how to interpret competing HTSUS provisions, "this court has an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." *MetChem, Inc. v. United States*, 513 F.3d 1342, 1345 (Fed. Cir. 2008).

## II. The standard of review on appeal.

This Court reviews the CIT's grant of summary judgment for correctness as a matter of law, and "decide[s] *de novo* the proper interpretation of the tariff provisions." *Otter Prods., LLC v. United States,* 834 F.3d 1369, 1374 (Fed. Cir. 2016) (quotation omitted). While the Court will often use the CIT's opinion as the starting point of its analysis, *Magid Glove*, 87 F.4th at 1357, "on questions of law, [the Court] will defer to neither Customs' nor the Court of International Trade's interpretations" and instead "decides such questions afresh." *Universal Elecs. Inc.,* 112 F.3d at 491-92.

## ARGUMENT

### I. The text of heading 3004 covers Medical Foods prescribed to treat life-threatening diseases in young children.

The Medical Foods fall squarely within the plain text of heading 3004. Heading 3004 covers:

> medicaments consisting of mixed and unmixed products for therapeutic or prophylactic uses, put up in measured doses . . . or in forms or packings for retail sale

It is not disputed that Medical Foods are mixed products that are sold in measured doses for therapeutic uses; namely, to treat diseases in infants and young children. Indeed, DOJ so conceded (Appx4924) and the CIT so admitted, noting: "[i]t could be argued that the products . . . are medicaments because they are for use in the internal treatment of human ailments." Appx12 (quotation omitted). But the CIT nonetheless ignored the plain meaning of heading 3004 as well as the principal use of the Medical Foods (to treat diseases), and wrongly opined that the Medical Foods are not "medicaments" classifiable under heading 3004 because they include "nutritional substances." Appx16-Appx26, Appx30.

#### A. Medical Foods are "medicaments consisting of mixed products for therapeutic uses."

Under GRI 1, the first step to classify a product is to confirm whether it meets the terms of a heading. *Magid Glove*, 87 F.4th at 1358.

If a term is not defined, it is presumed to have its common meaning, *E.M. Chems*, 920 F.2d at 913, which is presumed to be the same as the commercial meaning. *Simod Am. Corp. v. United States,* 872 F.2d 1572, 1576 (Fed. Cir. 1989). Here, "medicament" *is* defined in heading 3004 as a product intended for therapeutic use, and this definition aligns with the term's common meaning, a century of precedent, and relevant ENs.

The term "medicaments" is defined by heading 3004 itself. Heading 3004 states that "medicaments" are articles "consisting of mixed products for therapeutic use." Thus, if Medical Foods are, or are comprised of, products for therapeutic use, they fall within the plain terms of the heading. *See Patients Mut. Ass. Collective Corp., v. Comm'r of Internal Revenue*, 151 T.C. 176, 190-96 (U.S. Tax Ct. 2018) (explaining that, as used by Congress, "consists of" at least includes the items that follow, and may sometimes sweep more broadly). The CIT was wrong to ignore that heading 3004 itself defines "medicaments" in a way that plainly includes Medical Foods. *See Colonial Press Intern Inc. v. US.*, 788 F.3d 1350 (Fed. Cir. 2015) ("the words of a statute must be read in their context") (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also Rubie's Costume Co.*, 337 F.3d at 1357 ("[A] reading of the exclusion in

Note 1(e) to Chapter 95 . . . that focuses solely on the term 'fancy dress' and turns a blind eye to the immediately following words 'of textiles, of chapter 61 or 62' construes the term fancy dress in disregard of the context of the exclusion as a whole.").

As in the plain text of heading 3004, the term "medicament" is defined in dictionaries and other treatises as "a substance used in therapy"[6] or "for medical treatment."[7] It is also regularly equated to "medicinal."[8] For over 100 years, courts construing the HTSUS have relied on such dictionary definitions and defined the terms "medicaments" and "medicinal" in the same way: based on the product's therapeutic use. For example, in 1916, when ruling that a malt soup stock was "medicinal" under the tariff schedules, this court's predecessor stated a product is medicinal if it is "something which is of use, or believed by the prescriber or user fairly and honestly to be of use, in

[6] *Medicament*, Merriam-Webster Online Dictionary https://www.merriam-webster.com/dictionary/medicament.

[7] *Medicament,* Oxford English Dictionary ("a substance used for medical treatment; a medicine, a remedy"), *available at* https://www.oed.com/search/dictionary/?q=medicament; *see also Medicament,* Stedman's Medical Dictionary (24th ed.) ("a medicine . . . a remedy").

[8] *See id.*

curing or alleviating, or palliating or preventing some disease or affection of the human frame." *Britt, Loeffler & Weil v. United States*, 7 Ct. Cust. 118 (1916) (quoting *Dodge & Olcott v. United States*, 130 F. 624 (1891)).

The courts have also long been clear that products are "medicinal" even when made from plants—so long as they are used to treat diseases. *See McKesson & Robbins v. United States,* 3 Ct. Cust. 515, 520 (1913) (menthol extracted from a peppermint plant is a "medicinal preparation" because it was used as a medicine); *United States v. Hillier's Son Co.*, 14 Ct. Cust. App. 216 (1926) (resin made from plant extract is a medicinal preparation because it was used to treat skin diseases); *United States v. Wm. Cooper & Nephews, Inc.,* 22 C.C.P.A. 31 (1935) (noting that plants and minerals are the source of most medicines and finding that plant-based resins are medicinal preparations because they have therapeutic properties and are used for the prevention, cure, or alleviation of disease); *United States v. Alltransport, Inc.*, 44 C.C.P.A. 149, 152 (1957) (A product is medicinal if it is "of use . . . in curing *or* alleviating, or palliating or preventing, some disease or affliction of the human frame").

Once the meaning of a tariff term is established, that meaning remains controlling until a change in the statute compels a revised

construction. *See Intercontinental Marble Corp. v. United States*, 381 F.3d 1169, 1176 (Fed. Cir. 2004) (citing *Lonza, Inc. v. United States*, 46 F.3d 1098, 1106 (Fed. Cir. 1995)). No such change has occurred here. Rather, this Court has continued to define "medicaments" like medicinal substances—in terms of their therapuetic use. In *Warner-Lambert Company v. United States*, 28 C.I.T. 939, 341 F.Supp.2d 1272, 1277 (2004), *aff'd*, 425 F.3d 1381 (Fed. Cir. 2005), the CIT found and this Court affirmed that, to be classified as a "medicament" under heading 3004, a product must be principally for therapeutic use—just as prior courts determined when classifying "medicinal substances." The CIT further explained that, while Vitamin C products can be "medicaments" because they have the therapeutic use of preventing scurvy, the Vitamin C drops at issue were not medicaments classified under heading 3004 because they are not principally used to treat that disease, but rather taken for general wellness reasons. 341 F.Supp.2d at 1280-83.

The ENs confirm that classification as a "medicament" consisting of products for therapeutic use under heading 3004 is based on the article's use to treat or prevent ailments. The ENs to heading 30.03 state, in "language equally applicable to heading 30.04" (Appx12): "This

heading covers medicinal preparations for use in the internal or external treatment or prevention of human or animal ailments." The ENs to heading 3004, in turn, state:

> [T]his heading excludes food supplements containing vitamins or mineral salts which are put up for the purpose of maintaining health or well-being *but have no indication as to use for the prevention or treatment of any disease or ailment*.

EN 30.04 (2012). This again clarifies that the focus of heading 3004 is on the use of the product; the key classification question is whether the product is used to treat disease—which is the undisputed use of the Medical Foods. And the ENs to heading 2106 further confirm that clear Congressional intent, stating that, while "this heading covers … preparations, often referred to as food supplements, based on extracts from plants, fruit concentrates, honey, fructose, etc. and containing added vitamins …. it does *not* cover "[s]imilar preparations … *intended for the prevention or treatment of diseases and ailments*," which are "excluded" from heading 21.06 and instead covered by "heading 30.03 or 30.04." EN 21.06 ¶ 16 (emphasis added).

It is undisputed that the Medical Foods are therapeutic products intended and used to treat infants and young children suffering from specific diseases, which cannot be treated by modification of a normal

diet. Appx5; *see also* 21 U.S.C. §360ee(b)(3) (defining "medical food"); 21 C.F.R. §101.9(j)(8) (same). The Medical Foods do so by, *inter alia*, preventing the toxic build-up of amino acids that cause severe physical impairments and brain damage. Appx176-Appx178. In many cases Medical Foods provide the only means of treating the child's disease. Appx176-Appx178; Appx35.

The Government does not dispute that the Medical Foods are therapeutic. Appx4924 (conceding that "because… Medical Foods are used in nutritional therapy to treat diseases, they are 'therapeutic' articles."); Appx4744 ("Nutricia's medical foods are therefore therapeutic articles[.]"). And there is no dispute that the products meet the other requirements of heading 3004; they are "put up in measured doses . . . or in forms or packings for retail sale." E.g., Appx2648-Appx2654. Thus, the Medical Foods fall squarely with the terms of heading 3004.

### B. Medical Foods are *prima facie* classifiable under heading 3004 because they are principally used to treat diseases.

This Court has already held that heading 3004 is a principal use provision. *Warner-Lambert,* 425 F.3d at 1384 ("Heading 3004 thus is a 'use' classification, and according to the tariff schedules' [ARI] 1(a), 'the

controlling use is the principal use.'") (quoting *Primal Lite v. United States,* 182 F.3d 1362, 1363–64 (Fed. Cir. 1999)); *see also Warner-Lambert*, 341 F. Supp. 2d at 1277 (defining a "use provision" and stating: "On its face, HTSUS heading 3004, *supra,* is such a provision."). And this Court then stated that medicaments under heading 3004 are "described by their use 'for therapeutic or prophylactic' purposes." 425 F.3d at 1385.

ARI 1(a) states that classification "is to be determined in accordance with the use in the United States . . . of goods of that class or kind to which the imported goods belong[.]" In other words, the rule calls for "a determination as to the group of goods that are commercially fungible with the imported goods." *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1380 (Fed. Cir. 2011) (citing *Primal Lite,* 182 F.3d at 1365).

To make this determination, the courts examine seven factors, called the "*Carborundum* factors," to determine whether or not the imported product falls within the "class or kind" of goods in a tariff provision. *See Aramont USA, Inc. v. United States,* 671 F.3d at 1312-1316. These factors are evaluated under a "totality of the circumstances" test and include: (1) the use of the merchandise; (2) the general physical characteristics of the merchandise; (3) the recognition in the trade of this

use; (4) the expectation of the ultimate purchasers; (5) the economic practicality of so using the import; (6) the channels of trade in which the merchandise moves; and (7) the environment of the sale (e.g., the manner in which the merchandise is advertised and displayed). *Len-Ron Mfg. Co. v. United States,* 118 F.Supp.2d 1266, 1282 (C.I,T. 2000) (citing *United States v. Carborundum Co.,* 536 F.2d 373, 377 (C.C.P.A. 1976)). Here, all seven factors confirm that the Medical Foods are of the same class or kind as "medicaments for therapeutic use."

**1. Medical Foods are used as medicaments.**

The use of the merchandise is not contested; the Medical Foods are used to alleviate or prevent certain diseases, syndromes, symptoms or conditions. *See* Appx5, Appx12, Appx19-Appx24; Appx188-Appx200. Each of Nutricia's products is used solely as nutrition therapy to treat young children with specific and dangerous medical conditions and disorders. Appx172-Appx180. They have no other use. Nor could they; Medical Foods are defined by Congress as products required to treat patients suffering from specific illnesses that cannot be treated by modification of a normal diet or other medications. *See* 21 U.S.C. §360ee(b)(3); 21 C.F.R. §101.9(j)(8)(b).

Moreover, Medical Foods are to be used under the supervision of a healthcare professional. Appx189, Appx192. On some occasions, placement of a nasogastric tube or percutaneous gastrostomy tube may be needed to deliver the Medical Food (e.g., in children with SBS). Appx179. "These formulas cannot be readily obtained by the general community. They are expensive, often unpalatable, and potentially harmful to otherwise healthy patients." Appx192. Medical Foods thus are fungible with other medicinal products—not generic "foods." *See Primal Lite, Inc.,* 182 F.3d at 1365 (("[W]e construe the call for a determination as to the [class or kind] of goods that are commercially fungible with the imported goods.").

### 2. Medical Foods have physical characteristics similar to medicaments.

Like other medicaments, the Medical Foods have been designed, produced, studied, and prescribed to treat specific illnesses. *See* pp. 7-15 *supra*. Except for Ketocal®, the essential ingredients that make the products effective are pharmaceutical grade individual amino acids that must be specially manufactured by companies that produce other medicaments, to meet the desired medical purpose of each product. Appx184-Appx186, Appx188. For MSUD Lophlex® LQ, Periflex® Infant,

Periflex® Jr., and Neocate® Junior, it is not just the special production of individual amino acids, but how Nutricia combines these active ingredients that makes the products effective to treat specific diseases. Appx184-Appx187. Ketocal® Liquid is specially manufactured with isolated ingredients and fat sources to create the high fat-to-carbohydrate ratio needed to reduce the intensity and frequency of seizures. Appx187-Appx188

By definition, Medical Foods must possess unique physical characteristics—not appearing in normal foods—because Medical Foods are used only to treat or prevent disease, and only when "modification of the normal diet alone" is not sufficient. 21 C.F.R. §101.9(j)(8)(i) and (ii).

#### 3. Medical Foods are recognized in the trade as medicaments.

Nutricia's Medical Foods are recognized as medicaments by physicians, other medical professionals, and patients. Appx200-Appx201. For example, Dr. Essers stated that he was provided samples of these products and kept Neocate® Junior and Neocate® Infant in his office to provide to patients. Appx201. Parents generally would not be aware of Medical Foods because they are not commonly advertised on television, radio, or the internet, and are not available in grocery stores. Appx200-

Appx201. Rather, physicians prescribe or recommend Medical Foods, and tell patients on how to access and order them. Appx200-Appx201.

Because of the recognized utility of the Medical Foods as first-line or second-line therapies, hospitals and outpatient care facilities keep them in their inventory at all times. Appx200-Appx201. The recognition of the clinical usefulness of Medical Foods within the medical trade is further confirmed by the hundreds of efficacy studies covering such topics as the impacts of diet therapy for children with Eosinophillic esophagitis and long-term outcomes of amino acid formulas. Appx454-Appx564.

#### 4. Purchasers of Medical Foods have the same expectations as purchasers of medicaments.

Medical Foods are "purchased by a child's legal guardian(s) for their ill children." Appx183. These guardians understand that the Medical Foods are not commonly found "over the counter" at grocery stores or pharmacies, but rather typically are prescribed by a medical provider. Appx183. These products are very expensive as compared to baby foods, and so purchasers defray the cost through medical insurance. Appx183. The expectation of the purchaser is that the Medical Food will prevent or ameliorate the symptoms their child suffers from—symptoms that would continue if the child instead ate normal foods. Appx183. The parents and

guardians who purchase Medical Foods also expect that the treating physician who prescribed the Medical Foods will monitor the child's progress. Appx183; *see also* 21 U.S.C. §360ee(b)(3) & 21 C.F.R. §101.9(j)(8) (requiring by law that "medical foods" be "consumed or administered enterally under the supervision of a physician").

**5. Given the high cost of medical foods, it is only practical to use them as medicaments.**

Medical Foods are far more costly than the regular foods or formula taken by healthy children. *See* p. 18 *supra* (discussing findings of Dr. Robles upon comparing Medical Foods and baby foods). Given this substantial price difference, it would make no economic sense to use these products for non-medical purposes. Appx2710. And due to their higher cost, patients who are prescribed the Medical Foods seek medical insurance reimbursement for these products. Appx1733-Appx1762. Thus, the subject Medical Foods are used like medicaments, not like regular infant formulas or baby food. Appx2718.

**6. Medical Foods are sold in the same channels of trade as medicaments.**

The Medical Foods are not sold through grocery stores, convenience stores, or food distributors. Appx2700-Appx2702. Rather, Nutricia sells its products to hospitals, home healthcare or durable medical equipment

retailers, and wholesalers. Appx4367, 12:20-24. And the largest channel of trade for Medical Foods is the institutional sales channel (i.e., medical institutions and distributors), which accounted for 42.8% of sales for the 2014-2020 period. Appx2700. In contrast, most consumers of baby foods purchase those products at supermarkets (84%). Appx2702.

#### 7. Medical Foods are sold in an environment similar to that of medicaments.

Nutricia's products are packaged, advertised, marketed and sold in an environment similar to that of a medicament, not a food. Appx172. There are no cute babies on Nutricia's labels. Rather, the product labels include dosage amounts, warnings that the products must be administered only under medical supervision, and indications as to what diseases each product is designed to treat. Appx184.

Nutricia does not channel its advertising on television or in magazines. Rather, Nutricia focuses its marketing of the Medical Foods at medical conferences and through training sessions for doctors, health care providers, and healthcare institutes. Appx2701. In contrast, baby foods are directly marketed to final consumers. Appx2701. Indeed, in 2014 the baby food industry spent approximately $104.5 million on

advertising. Appx2703, Appx2703 n.48. Thus, Medical Foods' environment of sale is like that of medicaments, not that of foods.

All of the *Carborundum* factors thus support classification of Medical Foods as medicaments for therapeutic use under heading 3004.

### C. The CIT erred in finding that "medicaments" covered by heading 3004 cannot also be nutritional.

Despite the fact that Medical Foods are medicaments used to treat diseases and thus are covered by heading 3004 under its plain terms as well as pursuant to the *Carborundum* use analysis, the CIT found that Medical Foods cannot be classified under heading 3004 because they are comprised of "nutritional substances." Appx26. Indeed, the court went so far as to hold that "all such [nutritional] products" are "exclude[d] from chapter 30." Appx26. To reach this conclusion the court violated GRI 1 by bypassing the plain and common meaning of the terms of heading 3004, ignored this Court's precedent, and improperly relied on the ENs.

Rather than first confirming that Medical Foods were *prima facie* classifiable under the terms heading 3004, the CIT wrongly stated that, under GRI 1, it was first required to look at "relative" chapter notes. Appx13. The CIT then relied on Chapter 30 note 1(a), which is an exclusionary note that provides that Chapter 30 does not include:

> Foods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters), other than nutritional preparations for intravenous administration (Section IV)

The CIT reasoned that, because this exclusion does not apply to "nutritional preparations for intravenous administration," the exclusion *does* apply to all "nutritional substances" (Appx14)—thus effectively holding that the term "medicaments" in heading 3004 means a product "not made of nutritional substances." To support this conclusion, the CIT relied on the ENs, asserting that they indicate that a product made of "nutritional substances" cannot be classified under heading 3004 unless it includes a "medicinal substance." Appx15-Appx17. Without analyzing the term "medicament" or any other terms in heading 3004, as required by GRI 1, the CIT held, for the first time ever, that classification under heading 3004 is determined based on the physical characteristics of a product, not on its use—and that products made of nutritional substances cannot be classified under that heading. Appx26. Below we unpack the many errors in the CIT's convoluted reasoning.

<u>First</u>, the CIT erred by starting (and ending) its analysis applying a chapter exclusionary note (Chapter 30, Note 1(a)) before confirming the article was *prima facie* classifiable under a heading in that chapter.

Under GRI 1, the first step in the classification analysis is to confirm whether a good meets the term of a heading, *then* determine if there are any "relative" chapter notes. *See Magid Glove*, 87 F.4th at 1358 (Fed. Cir. 2023) ("[A] proper classification analysis starts with the terms of the headings."). Notes provide guidance on interpreting headings; e.g., definitional notes help define heading terms, and exclusionary notes may require a product that is *prima facie* classifiable under a heading be instead classified under another heading under which that product is also *prima facie* classifiable. But they cannot change the heading terms.

By examining the exclusionary note before determining whether the terms of heading 3004 applied, the CIT failed to heed this Court's admonition in *Sharp Microelectronics Technology*, 122 F.3d at 1450, where it held that the CIT erred in "employing [a chapter exclusionary note] as an analytical tool before one first decides if an article is classifiable under the [proper] heading." In making that same error here, the CIT redefined the terms of heading 3004 contrary to GRI 1, the terms of the HTSUS when read as a whole, and this Court's precedent.

<u>Second</u>, the CIT incorrectly found that medicaments consisting of products for therapeutic use cannot be made of nutritional substances.

Note 1(a) does not explicitly or implicitly state that Chapter 30 excludes all products made from nutritional substances; indeed, it does not define any terms in the Chapter, but merely describes a limited set of goods that cannot be classified there (*e.g.*, dietetic and diabetic foods). If Congress intended for Note 1(a) to exclude all nutritional substances from Chapter 30 it could have said so explicitly, listing "nutritional products" alongside dietetic, diabetic, and supplemental foods. It did not, and the CIT was wrong to ignore that choice. *See Keene Corp. v. United States,* 508 U.S. 200, 208 (1993) (the court has a "duty to refrain from reading a phrase into the statute when Congress has left it out").

The CIT also wrongly relied on the parenthetical phrase "other than nutritional preparations for intravenous administration" to conclude that all other, non-intravenously administered nutritional products are excluded from Chapter 30. That parenthetical phrase was added to the exclusionary note at issue by the WCO and implemented into U.S. law in 2002.[9] And the reason for this addition was the desire to ensure that

[9] Am. Harm. Sys. Nomenclature (2002) at 38.

nutritional intravenous preparations were included in Chapter 30.[10] The addition of this limiting phrase, intended to narrow the scope of the exclusion, at the end of the exclusionary note cannot logically be viewed to *expand* the note's scope to exclude all nutritional substances from Chapter 30. The 2002 amendment to Note 1(a) removing intravenous nutritional products from the scope of the exclusion did not change the terms or meaning of the preceding and preexistent phrase ("Foods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters))," which has always been limited to products that, unlike Medical Foods, are not used to treat a disease. *See O'Neil v. Department of Housing and Urban Development*, 220 F.3d 1354 (2000) ("In light of Congress's choice of different language in subsections of the same statute, it would be inappropriate to construe the narrower language that Congress chose . . . . as if it were equivalent to the broader language that Congress chose . . . .").

The CIT was also wrong to assume that "nutritional substances" cannot be "medicinal" or "medicaments." The NIH defines nutrients as:

---

[10] See Explanatory Memorandum, Customs Tariff Amendment Bill (No. 5) 2001 Bill 2013 at 17 (Austl.)

> Chemical substances required by the body to sustain basic functions and are optimally obtained by eating a balanced diet[,] [including:] [c]arbohydrates, lipids, proteins, vitamins, minerals, and water.[11]

And EN 30.04 similarly provides: "The major nutritional substances in food are proteins, carbohydrates and fats. Vitamins and mineral salts also play a part in nutrition."

The CIT never defined what a "medicinal substance" is—except to opine that it is not a nutritional substance. *See* Appx6-Appx18. But as discussed above, "medicinal substances" are defined by the courts, dictionaries, and the ENs based on their therapeutic use, not their physical characteristics or components. Like nutritional substances, medicinal substances are commonly made from animals, plants and minerals—as the courts have explained in decisions dating back a century. *See* Arg. §I.A. Indeed, Chapter 30 includes numerous products that are made solely from nutritional substances, including: insulin (3004.31.00 made from proteins), yeast (*see* Chapter 21, Note 1(g)), Lorenzo's Oil (NY F84310 (March 28, 2000), vegetable extracts (Chapter

[11] *Biochemistry, Nutrients*, National Institutes of Health U.S. National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK554545/ (last visited Apr. 26, 2024).

30, Note 3(b) defining the term "mixed" product of heading 3004 to include vegetable extracts), and vitamins (e.g., Vitamin B2 (3004.50.10), Vitamin B12 (3004.50.20), Vitamin E (3004.50.30)). The CIT's interpretation of Note 1(a) as excluding from Chapter 30 all products that are comprised of "nutritional" substances effectively rewrites the statutory terms of the HTSUS, contrary to Congress's clear intent to include nutritional substances within Chapter 30 *if the products have therapeutic uses*. That is an improper use of the note. *See Midwest of Cannon Falls, Inc. v. United States*, 122 F.3d 1423, 1428 (Fed. Cir. 1997)[12] (refusing to import "extraneous limitations" from explanatory notes "not based on the actual language of the headings").

Further, in *Warner Lambert*, this Court found that Vitamin C drops (which contain only nutritional substances) *could* be considered medicaments because Vitamin C is a treatment for scurvy, but that the drops at issue were not classified under heading 3004 because they were not "principally used" to treat that (or any other) disease. 341 F.Supp.2d at 1277-84. Here, in contrast, it is undisputed that the Medical Foods are

[12] *Superseded on other grounds as stated in Gerson Co. v. United States*, 898 F.3d 1232 (Fed. Cir. 2018)

principally used to treat diseases. Appx12, Appx19-Appx24. They accordingly should be classified as medicaments under heading 3004.

The CIT's reliance on the ENs to headings 2106 and 3004 to support its interpretation of Chapter 30, Note 1(a) is also misplaced. In fact, these ENs support Nutricia's interpretation of that exclusionary note. The ENs to heading 3004 state that foods that contain "medicinal substances" are not classified in heading 3004 if the "medicinal substances" are added "solely . . . to increase" the "nutritional value" of the product. EN 30.04. If a "medicinal substance" is capable of "only" increasing the "nutritional value" of a product as the ENs state, then that "medicinal substance" *must also be a "nutritional substance."* The CIT thus was wrong to suggest that a substance cannot be both nutritional and medicinal.

The ENs to heading 3004 also state that food supplements that contain vitamins (which are both nutritional and medicinal in nature) are not classified under heading 3004 if the vitamins are used only to maintain health (e.g., vitamin B12 in a multi vitamin), but *are* classified under heading 3004 if they are used to prevent or treat a disease (e.g., vitamin B12 prescribed by a doctor to treat anemia). EN 30.04. Meanwhile, the ENs to heading 2106 state that food preparations similar

to "food supplements, based on extracts from plants, fruit concentrates, honey, fructose, etc. and containing added vitamins" (pure nutritional substances) are classified under heading 3004 if these products are "*intended for the prevention or treatment of diseases and ailments*." EN 21.06, ¶ 16 (emphasis added). Read together, the inescapable conclusion of these ENs is that even purely nutritional products (e.g., foods or supplements containing vitamins) are classified in 3004 *if they are used to prevent or treat a disease*. The CITs contrary reading of the ENs improperly changes the plain meaning and narrows the scope of heading 3004. *See Rubie's Costume Co.,* 337 F.3d at 1359 (The Court "shall not employ [ENs] to narrow the language of the classification of the heading itself…[a]bsent a clear[ ] showing of congressional intent.").

This Court previously rejected a similar attempt to use an exclusionary note to narrow the plain meaning of the heading text. *See Magid*, 87 F.4th at 1359-61 (rejecting attempt to rely on an exclusionary note to reclassify plastic-coated gloves from a heading covering gloves to a basket provision for plastics, and noting that doing so would "eviscerate" the meaning of the heading, where "the HTSUS drafters specifically address[ed] the very merchandise [ ] imported"). Here, as in

*Magid*, the HTSUS drafters meant to include nutritional products that are principally used to treat diseases under heading 3004.

## II. Note 1(a) to Chapter 30 does not apply to Medical Foods.

After the CIT wrongly relied on Note 1(a) to incorrectly redefine the terms of heading 3004 to exclude all nutritional substances, it used this same note to exclude Medical Foods from that provision. The CIT's conclusion that Medical Foods were covered by the narrow terms of Note 1(a) is contrary to the plain meaning of that note, basic rules of statutory construction, and the ENs.

Note 1 (a) does not cover all foods and beverages. It does not mention Medical Foods at all, and it does not say—or even suggest—that it covers all products made of nutritional substances. For a product to be covered by this note it must be: (1) a certain type of food or beverage, such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters, and (2) *prima facie* classifiable under Section IV. As discussed below, Medical Foods are neither.

### A. Medical Foods are not of the same class or kind as diabetic, dietic or fortified foods or food supplements.

To meet the first criteria, the Medical Foods must be of the same class or kind of goods as those listed in the note (i.e., dietetic, diabetic or

fortified foods, food supplements, tonic beverages and mineral waters). Under the rule of *ejusdem generis*, "where an enumeration of specific things is followed by a general word or phrase, the general word or phrase is held to refer to things of the same kind as those specified." *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1392 (Fed. Cir. 1994). The rule of *ejusdem generis* requires that "the imported merchandise possess the essential characteristics or purposes that unite the articles enumerated *eo nomine* in order to be classified under the general terms." *Id.*; *see also Apple Inc. v. United States*, 964 F.3d 1087, 1096 (Fed. Cir. 2020) (explaining that a parenthetical served to "better define and explain" a provision's application).

Dietetic and diabetic foods may be used as part of a conventional diet to manage a condition that requires a modified diet, like diabetes, or to help someone lose weight or perhaps lower their cholesterol. The term "dietetic" means "of or relating to diet" and the term "diet" means "what a person or animal *usually eats and drinks*; daily fare"; "a special or limited selection of food and drink, chosen or prescribed to promote

health or a gain or loss of weight."[13] Diabetic foods are consumed to manage certain nutrients (*e.g.*, sugar) using a modified diet of conventional food.[14] While they may be recommended for persons with a medical condition—diabetes—they do not treat that condition.

Diabetic and dietetic foods also—unlike Medical Foods—do not replace a normal diet. Someone who is trying to lose weight may drink skim milk instead of whole milk. And someone who is diabetic may drink sugar-free soda instead of regular soda. However, skim milk is still milk, and sugar-free soda is still soda. Someone who is not diabetic may drink skim milk or sugar-free soda for reasons such as a taste or convenience. Indeed, the Mayo Clinic notes that "a diabetes diet is the best eating plan

[13] *Dietetic*, https://www.merriamwebster.com/dictionary/dietetic ("of or relating to diet"); *Diet*, https://www.merriamwebster com/dictionary/diet ("food and drink regularly provided or consumed" and "the kind and amount of food prescribed for a person or animal for a special reason" and a regimen of eating and drinking sparingly so as to reduce one's weight").

[14] *Diabetics diet*, MayoClinic.org, https://www.mayoclinic.org/diseases-conditions/diabetes/in-depth/diabetes-diet/art-20044295 ("A diabetes diet is a healthy-eating plan that's naturally rich in nutrients and low in fat and calories.").

for most everyone."[15] Conversely, the FDA has explained that Medical Foods are not used to treat diabetes.[16]

The other products listed in Note 1(a) are fortified foods,[17] food supplements, tonic beverages and mineral waters. These products also are consumed as part of a normal diet, alongside regular food products—not in place of them, as is the case for Medical Foods.

All of the products listed in Note 1(a) are marketed like other foods and sold in grocery stores like other foods. They are not "prescribed" by health care experts or doctors, and consumers are not eligible for insurance reimbursement for purchases of those items. The ENs also describe these foods as being intended to improve the health and wellbeing of consumers, but not to prevent or treat a disease. EN 30.04

Medical Foods are not at all like diabetic, dietic, or fortified foods or supplements. They are a unique class of products specifically defined by

---

[15] *Id.*

[16] FDA Guidance, *Frequently Asked Questions About Medical Foods* at 10, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-frequently-asked-questions-about-medical-foods-third-edition.

[17] Fortified foods are "enriched (as with vitamins or minerals) so that nutritional value is improved." *Fortified*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/fortified.

Congress and regulated by the FDA. *See* Background §I.A. By law, Medical Foods are taken only under medical supervision, when modification of a conventional diet is impossible or insufficient to treat the underlying illness. *See* 21 U.S.C. §360ee(b)(3); 21 C.F.R. §101.9(j)(8); Appx188-Appx202. Unlike diabetic or dietetic foods, the Medical Foods mostly or fully replace a conventional diet because children with the diseases at issue cannot tolerate most normal foods. *Id.* And unlike dietetic or diabetic foods, exclusive consumption of certain Medical Foods by healthy persons without medical supervision may cause harm or illness, including malnutrition. *E.g.*, Appx189, Appx202.

Finally, Medical Foods are not marketed, sold, advertised or labeled like diabetic, dietetic, or fortified foods or supplements. Rather, they are primarily marketed to and prescribed by doctors, and often sold through medical distribution channels and hospitals. *See* Background §I.D. None of the foods listed in Note 1(a) possess these characteristics. Accordingly, Medical Foods are not products "such as" the dietetic, diabetic, and supplemental food products listed in Note 1(a)—and therefore they are not excluded from heading 3004 under that note.

The Court therefore erred as a matter of law when it interpreted the list of excluded foods set forth in Note 1(a) to encompass Medical Foods. By listing only certain types of food products in that note, Congress chose to only exclude those types of products, not all products that qualify as "food"—and certainly not Medical Foods, which are categorially unlike the foods and beverages listed in Note 1(a). *See ENI Tech., Inc. v. U.S.*, 641 F. Supp. 2d 1337, 1354-1355 (C.I.T. 2009) (applying *expressio unius est exclusion alterius* to limit a broadly worded definition provided to the four enumerated examples).

### B. Medical Foods are not *prima facie* classifiable in Section IV.

The CIT interpreted the term "(Section IV)" in Note 1(a) to mean that foods and beverages described in the preceding phrase "are to be" classified on Section IV. *See* Appx14. This is not the correct interpretation of this term, and it is not how exclusionary notes are commonly and practically interpreted. Exclusionary notes often describe a class of goods by name, and then use a parenthetical to state where the goods "are" *prima facie* classifiable. Such notes only apply if the good is both described by the note *and* is classifiable in the listed tariff provisions.

For example, Note 1(e) to Chapter 84 is an exclusionary note that covers "textile materials for technical use (heading 5911)." When considering whether air filters were classifiable under heading 8421 (parts of filtering or purifying machinery), CBP did not find this note applied by reasoning that the air filters were textile materials for technical use and therefore "are to be classified" in heading 5911. Rather CBP examined the terms of heading 5911 pursuant to GRI 1, and because the air filters met the terms of and were *prima facie* classifiable under that heading, the exclusionary note applied and the goods were not classified under heading 8421. *See* Cus. Bul. Dec. Vol. 37, No. 28 at pp. 30-35 (July 9, 2003). The same analysis is required here. In order for Chapter 30, Note 1(a) to apply, Medical Foods must be *prima facie* classifiable under a heading within Section IV.

The CIT instead read the Chapter 30 exclusionary note to mean that Medical Foods are classifiable in Section IV (heading 2106). It reasoned that, because Medical Foods are foods described in Note 1(a) (which is wrong), these products "are to be" classified in Section IV (heading 2106). Appx14-15. This logic is backwards, and the CIT's interpretation of Note 1(a) would yield absurd results.

For example, salmon is a well-known diabetic and dietic food; it is recommended for consumption by persons with diabetes and persons seeking to lose weight.[18] It is classified under Section I, Chapter 3, heading 0302 (fish, fresh or chilled)). Under the CIT's interpretation of Note 1(a), however, because salmon meets the terms of the note, it "is to be classified in Section IV." But, salmon is classified under Section I. There are numerous other foods, beverages and nutritional substances that are not classified in Section IV; for example, animal products in Section I, vegetable products in Section II, animal and vegetable fats and oils in Section III, mineral products (salts) in Section V. And there are numerous products classifiable in Section IV that are not nutritional; for example, waste in Chapter 23 and tobacco in chapter 24. It is thus absurd to read Note 1(a) as providing that any good that arguably meets the terms of that note must be classified under Section IV—regardless of whether it is classified elsewhere. And absurd interpretations of statutory text are "to be avoided." *Dupuch-Carron v. Secretary of Health and Human Services*, 969 F.3d 1318, 1330-31 (2020)

---

[18] *E.g.*, *What superstar foods are good for diabetes?*, American Diabetes Association, https://diabetes.org/food-nutrition/food-and-blood-sugar/diabetes-superstar-foods.

In short, only goods *prima facie* classifiable under a heading in Section IV can be excluded from Chapter 30 under Note 1(a). As demonstrated below, Medical Foods are not *prima facie* classifiable under heading 2016 (or any provision in Section IV), so Note 1(a) does not apply.

## III. The Medical Foods cannot be classified under heading 2106's residual basket provision.

Heading 2106 is a residual "basket provision" that covers: "Food preparations not elsewhere specified or included." Under GRI 1 and the plain terms of this heading, a good is prima facie classifiable under this heading only if the good is not classified elsewhere. *See R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1354 (Fed. Cir. 2014) (holding that certain vegetables are classified under heading 2004 because 2106 is a basket provision, and any products that are "specified or included" in another tariff heading cannot be classified in 2106). Indeed, that is why this Court, in *Franklin v. United States*, 289 F.3d 753, 757-761 (Fed. Cir. 2002), overturned a CIT decision classifying coral sand products under heading 2106's residual basket provision, and held that those products must be classified under a more specific purification heading based on their principal use: purifying water. Like the vegetables in *R.T. Foods* and the coral sand products in *Franklin*, Medical Foods are classifiable

under a more specific provision of the HTSUS—heading 3004—based on their principal use (i.e., treating diseases). Thus, Medical Foods cannot be classified under heading 2106.

But even if Medical Foods were arguably *prima facie* classifiable under heading 2106, they still cannot be classified under this provision because (1) Note 1(f) to Chapter 21 specifically excludes products classified under heading 3004, and (2) heading 3004 is more specific than heading 2106, requiring classification of Medical Foods under heading 3004 pursuant to GRI 3.

### A. Note 1(f) to Chapter 21 excludes products that are prima facie classifiable under heading 3004.

Note 1(f) to Chapter 21 states:

> 1. This chapter does not cover: . . .
>
> (f) Yeast put up as a *medicament or other products of heading 3003 or 3004.* (emphasis added).

Here, as demonstrated above (Arg. §I, *supra*), Medical Foods are *prima facie* classifiable under heading 3004, based on both the plain text of that heading and their principal use as therapy for specific diseases. Thus, under Note 1(f), Medical Foods are excluded from classification under heading 2016.

Further, even if the Medical Foods were thought to be *prima facie* classifiable under both headings 2106 and 3004, then (contrary to the CIT's conclusion, Appx37-Appx39), the two chapter notes (Note 1(a) to Chapter 30, and Note 1(f) to Chapter 21) *are* mutually exclusive: goods of chapter 21 cannot be classified in chapter 30, and goods of heading 3004 cannot be classified in chapter 21. In such a case, the more specific heading—here, 3004—prevails. *See Bauer*, 393 F.3d at 1251-52 & n.6 (Fed. Cir. 2004) (also noting that "resorting to" competing exclusionary notes before applying the rule of specificity would yield the "arbitrary result" that classification will be determined based on "which chapter [and corresponding note] the analysis began" with—a trap the CIT fell into here). It was error for the CIT to consider the exclusionary note to Chapter 30 to avoid that conclusion before first determining whether the competing heading texts answered the question. *See id.*at n.6*; LeMans Corp. v. United States*, 660 F.3d 1311, 1316-1322 & n.7 (Fed. Cir. 2011) (court first determined classification baed *solely on the terms of the competing headings*, and did not consider an exclusionary note until after it determined which heading applied).

### B. GRI 3(a) requires classification under heading 3004 because it is more specific than heading 2106.

Under GRI 3(a), "when goods are *prima facie* classifiable under two or more headings, the merchandise should be classified under the heading that provides the most specific description." *Franklin*, 289 F.3d at 757. In *Franklin*, the Court found GRI 3 "instructive" in determining whether a product should be classified under the heading 2106 basket provision or another (more specific) heading, stating:

> Even assuming *arguendo* that Customs was correct when it found that Franklin's coral sand was *prima facie* classifiable as a "[f]ood preparatio[n] not elsewhere specified or included" under heading 2106, heading 8421 provides a more specific description of the subject merchandise. Consequently, Appellant's coral is properly classified under that heading . . . .

*Id*. at 760.

The same reasoning applies here. Heading 3004 is a use provision—as this Court held in *Warner-Lambert,* 425 F.3d at 1384—whereas heading 2106 is a residual basket provision. As discussed above, a use provision is more specific than a basket provision, and the text of heading 3004, covering "medicaments consisting of mixed and unmixed products for therapeutic or prophylactic uses, put up in measured doses" is plainly more specific than heading 2106, covering "Food preparations not elsewhere specified or included." Therefore, under GRI 3(a) the Medical

Foods must be classified under heading 3004 even if the Court thought that they might also fall under heading 2106. *Franklin*, 289 F.3d at 760.

The CIT erred in presuming that Nutricia urged the Court to elevate GRI 3 over GRI 1. Appx26. Nutricia did not argue that GRI 3 trumps GRI 1. Rather, as explained above, Nutricia's Medical Foods are classified under heading 3004 pursuant to GRI 1 because they meet the plain terms of that heading, Note 1(a) to Chapter 30 does not apply, and the products cannot be classified under heading 2106 because it is a residual basket provision that excludes products classified elsewhere. But, if this Court believes the Medical Foods to be *prima facie* classifiable under both headings 3004 and 2106, then a GRI 3 analysis is required. *See Lemans Corp*, 660 F.3d at 1316; *Baue*r, 393 F.3d at 1251-53 (applying GRI 3 "rule of specificity" to resolve classification under competing headings). And under GRI 3(a), the Medical Foods must be classified under heading 3004 because it is more specific than heading 2106.

***

For all these reasons, the CIT erred in holding that the Medical Foods used to treat life-threatening diseases in young children are

classified under heading 2106's basket provision for foods not classified elsewhere rather than the facially applicable text of heading 3004.

Pursuant to GRI 6, if the Medical Foods are covered by heading 3004, then they are to be classified at the subheading level under 3004.50.50.40, the provision for medicaments . . .consisting of mixed products for therapeutic or prophylactic uses, put up in measured doses or in forms or packings for retail sale: Other medicaments containing vitamins or other products of heading 2936: Other: Other: Other. The Court should accordingly reverse the CIT's decision and classify the Medical Foods under subheading 3004.50.50.40.

## IV. The Medical Foods also are entitled to duty-free treatment under Subheading 9817.00.96.

Even if heading 3004 did not encompass the Medical Foods, they still qualify for tariff-free treatment under subheading 9817.00.96, which applies to products designed for use by handicapped persons. Given the Medical Foods meet the terms of this provision and Congress's intent that the terms apply broadly to ensure duty-free import of items relied on by handicapped persons, the CIT's conclusion that subheading 9817.00.96 does not apply was error.

### A. The Medical Foods are designed for use by handicapped children.

To be classified under subheading 9817.00.96 a product must be specially designed or used for the benefit of handicapped persons. U.S. Note 4 of Subchapter XVII, Chapter 98, defines the term "physically or mentally handicapped persons" as:

> (a) For purposes of subheadings 9817.00.92, 9817.00.94 and 9817.00.96, the term "blind or other physically or mentally handicapped persons" includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working.

This definition mirrors the ADA definition of disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. §12102(1)(A). Because there is no dispute that the Medical Foods are specially designed for infants and children that suffer from these disabilities, the products meet the precise terms of subheading 9817.0096 and are classified thereunder.

The CIT erred in finding that Nutricia's Medical Foods are not "[a]rticles specially designed or adapted for the use or benefit" of a "handicapped" person under subheading 9817.00.96. Appx37. It opined:

> Plaintiff interprets the terms "handicapped" and "physical or mental impairment" so broadly as to include virtually *any*

> serious medical condition . . . Nothing in the terms of subheading 9817.00.96, HTSUS provides or even connotes that Congress, . . . intended the scope of the subheading to be so broad as to cover foods, food supplements, or nutritional substances or ingredients of any type.

Appx37-Appx38.[19] This reasoning is flawed in several respects.

First, Nutricia does not claim that subheading 9817.00.96 covers "foods, food supplements, or nutritional substances or ingredients of any type." The issue before the Court is whether certain Medical Foods are covered by this subheading. Medical Foods are a narrow class of goods, which treat but do not cure rare diseases. That category of goods was created by Congress to ensure development despite the relatively small demand for these specialized medical products. *See* 61 Fed. Reg. at 60662. This is not the "broad" category of goods that the CIT posits.

Second, while the CIT took issue with Nutricia's "broad[]" interpretation of "handicapped," it failed to provide any explanation as to how infants and children with the diseases or disorders that necessitate Nutricia's Medical Food are *not* handicapped. These diseases

---

[19] In fact, the Government conceded below that that MSUD Lophlex®, Periflex® Infant, Periflex® Junior, and Ketocal® Liquid are "specially designed" for the use of "handicapped persons," and argued that only Neocate® Junior, is not. *See* Appx4747, n.7.

or disorders impair major life activities; they prevent patients from "caring for oneself" because the basic act of eating is largely impaired or prevented, requiring nutritional therapy monitored by a healthcare professional so that the patient does not suffer adverse metabolic, gastrointestinal, or neurological symptoms (e.g., brain damage, seizures, coma or death). *Supra*, Sec. I. Without Medical Foods, all of a patient's major life activities would be impaired. *Id.*

The legislative history shows Congress' intent for broad application of subheading 9817.00.96. The terms in subheading 9817.00.96 are special provisions of U.S. law that were enacted separately from Chapters 1-97. U.S. Note 4(a) and subheading 9817.00.96 were implemented as part of the Educational, Scientific, and Cultural Materials Importation Act of 1982, 96 Stat. 2329, 2346 (1983), to give effect to the Nairobi Protocol to the Florence Agreement on the Importation of Educational, Scientific, and Cultural Materials. *Starkey Labs. v. United States*, 6 F.Supp.2d 910, 911 (C.I.T. 1998). Congress recognized that the Nairobi Protocol imposed "strict obligations" on the United States, and was "intended to afford duty-free treatment not only for articles for the blind, *but all other handicapped persons without*

*regard to the source of their affliction*." S. Rep. No. 97-564, at 16- 17 (1982) (emphasis added); *see also* TD 92-77, 26 Cust. Bull. Dec. 240, 246 (1992).

Therefore, contrary to the CIT's unsupported view that Nutricia's interpretation of subheading 9817.00.96 was too broad, Congress in fact intended that subheading be applied broadly. And the text of that subheading easily encompasses Medical Foods since they are designed for use by children that qualify as "disabled" under the ADA, and thus "handicapped" under subheading 9817.00.96. Had Congress wanted to exclude Medical Foods from the scope of that subsection, it could easily have done so—but yet again, Congress did not make that choice.

### B. The Medical Foods are not "therapeutic" under Subheading 9817.00.96 because they do not cure diseases they treat.

Note 4(b) to Subchapter XVII, Chapter 98 provides that subheading 9817.00.96 does not cover "(iii) therapeutic and diagnostic articles[.]" But unlike in the context of heading 3004, which applies to "medicaments consisting of . . . substances for therapeutic . . . uses" in the context of Chapter 98, "therapeutic" specifically means to "heal" or "cure." *See Richards Med. Co. v. United States*, 910 F.2d 828, 831 (Fed. Cir. 1990) ("Congress intended to encourage the importation of that merchandise

which is designed to compensate for, or help adapt to, the handicapped condition. At the same time, Congress did not want to allow duty-free importation of merchandise which is used *to heal or cure* the condition causing the handicap.") (emphasis added) (referring to S. Rep. No. 97-564 (1982)); *see also Sigvaris, Inc. v. U.S.*, 227 F.Supp.3d 1327, 1336 (Ct. Int'l Trade 2017), *aff'd but criticized*, 899 F.3d 1308 (Fed. Cir. 2018) ("The subheading [9817.00.96] does not cover therapeutic articles, which have been defined as 'having healing or curative powers.'").[20]

It is undisputed that Nutricia's Medical Foods treat, but do not cure, certain diseases. *See* Background §I. As such, they qualify for tariff-free treatment under subheading 9817.00.96.

Thus, regardless of whether heading 3004 covers the Medical Foods (which it does for the reasons set forth in Arg. §I-II above), these products are entitled to duty-free treatment under subheading 9817.00.96. To conclude otherwise—and therefore apply significant tariff rates to these life-saving medical products, even while far less medically-critical products receive duty-free treatment under heading 3004 or subheading

[20] The CIT did not determine the meaning of "therapeutic" for purposes of subheading 9817.00.96. *See* Appx35.

9817.00.96—would be an absurd interpretation of the statutory text, and one that should be avoided. *See Patients Mut.*, 151 T.C. at 192 (statutory terms should be read to avoid "absurdity" if possible.); *Dupuch-Carron*, 969 F.3d at 1330-31 (2020) ("[a] reading of [a statute] which would lead to absurd results is to be avoided") (quotation omitted).

## CONCLUSION

This Court should reverse the decision below and hold that Medical Foods are primary classified under subheading 3004.50.50.40, and secondarily classified under subheading 9817.50.50.

/s/ John Brew
John Brew
Amanda Shafer Berman
Alexander H. Schaefer
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
Fax: (202) 628-5116

*Counsel for Nutricia North America Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 13,893 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

*/s/ John Brew*
John Brew

## CERTIFICATE OF SERVICE

I certify that on June 28, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ John Brew*
John Brew

# ADDENDUM

# TABLE OF CONTENTS

**Addendum Page**

Judgment and Slip Op. 23-170
(filed December 4, 2023) .......................................................................... Appx1-38

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **NUTRICIA NORTH AMERICA, INC.,**<br>Plaintiff,<br>v.<br>**UNITED STATES,**<br>Defendant. | **Before: Timothy C. Stanceu, Judge**<br>**Court No. 16-00008** |

**JUDGMENT**

Upon consideration of plaintiff's motion for summary judgment, Pl.'s Mot. for Summary J. (August 31, 2022), ECF Nos. 73 (Conf.), 74 (Public) ("Plaintiff's Motion"), defendant's cross-motion for summary judgment, Def.'s Cross-Mot. for Summary J. and Resp. in Opp'n to Pl.'s Mot. for Summary J. (Oct. 28, 2022), ECF Nos. 80 (Conf.), 81 (Public) ("Defendant's Cross-Motion"), and all other papers submitted herein, in conformance with the Opinion issued this day, and upon due deliberation, it is hereby

**ORDERED** that Plaintiff's Motion be, and hereby is, denied; it is further

**ORDERED** that Defendant's Cross-Motion be, and hereby is, granted; and it is further

**ORDERED** that judgment be, and hereby is, entered in favor of defendant.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: December 4, 2023
New York, New York

**Slip Op. 23-170**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **NUTRICIA NORTH AMERICA, INC.,**<br>Plaintiff,<br>v.<br>**UNITED STATES,**<br>Defendant. | **Before: Timothy C. Stanceu, Judge**<br>**Court No. 16-00008** |

**OPINION**

[Granting defendant's cross-motion for summary judgment on the tariff classifications of various nutritional preparations intended for use by patients with medical conditions]

Dated: December 4, 2023

*John B. Brew*, Crowell & Moring LLP, of Washington, D.C., for plaintiff. With him on the briefs was *Alexander H. Schaefer*. Also on the briefs were *Maria T. Vanikiotis* and *Alexander T. Rosen*, Crowell & Moring LLP, of New York, N.Y.

*Luke Mathers*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Justin R. Miller*, Attorney-In-Charge, and *Aimee Lee*, Assistant Director, Commercial Litigation Branch. Of counsel on the briefs was *Yelena Slepak*, Office of the Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection.

Stanceu, Judge: Plaintiff Nutricia North America, Inc. ("Nutricia"), contesting the denials by U.S. Customs and Border Protection ("Customs" or "CBP") of its administrative protests, claims that Customs incorrectly determined the tariff

classification of five imported products it describes as "medical foods." Before the court are the parties' cross-motions for summary judgment. The court awards summary judgment in favor of defendant United States.

## I. Background

The merchandise was imported on four entries made in November 2014 at the ports of Philadelphia, Pennsylvania and Washington-Dulles. Upon CBP's denial of its protests of the liquidations of these entries, plaintiff commenced this action. Summons (Jan. 8, 2016), ECF No. 1.

Plaintiff moved for summary judgment, arguing for tariff classification in either of two duty-free tariff classifications. Pl.'s Mot. for Summary J. (Aug. 31, 2022), ECF Nos. 73 (Conf.), 74 (Public); Mem. of Law and Authorities in Supp. of Pl.'s Mot. for Summary J. (Aug. 31, 2022), ECF Nos. 73 (Conf.), 74 (Public) ("Pl.'s Br."). Defendant responded and cross-moved for summary judgment, maintaining that the tariff classification determined by Customs upon liquidation of the entries was correct. Def.'s Cross-Mot. for Summary J. and Resp. in Opp'n to Pl.'s Mot. for Summary J. (Oct. 28, 2022), ECF Nos. 80 (Conf.), 81 (Public); Def.'s Mem. in Supp. of its Cross-Mot. for Summary J. and Resp. in Opp'n to Pl.'s Mot. for Summary J. (Oct. 28, 2022), ECF Nos. 80 (Conf.), 81 (Public) ("Def.'s Br.").

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to Section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(a)[1], which grants the court "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515" of the Tariff Act of 1930 ("Tariff Act"), *as amended*, 19 U.S.C. § 1515. The court adjudicates *de novo* actions to contest the denial of a protest. 28 U.S.C. § 2640(a)(1) ("The Court of International Trade shall make its determinations upon the basis of the record made before the court.").

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). In a tariff classification dispute, summary judgment is appropriate where "there is no genuine dispute as to the nature of the merchandise and the classification determination turns on the proper meaning and scope of the relevant tariff provisions." *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1371 (Fed. Cir. 2013) (citations omitted).

---

[1] All citations herein to the United States Code are to the 2012 edition.

**B. Description of the Merchandise**

The facts stated in this Opinion to describe the imported merchandise are taken from the submissions of the parties in support of their respective summary judgment motions and are not in dispute between the parties. From a review of these submissions, the court concludes that there is no genuine dispute as to the facts material to the classification of the products at issue.

The five imported products at issue in this case are "MSUD Lophlex® LQ," "Periflex® Infant," "Periflex® Junior," "Neocate® Junior," and "Ketocal® Liquid." Plaintiff describes the five imported products as "certain Medical Foods, which are a unique class of products defined and regulated by the Food and Drug Administration ('FDA') under the Orphan Drug Act, 21 U.S.C. § 360ee." Pl.'s Br. 1. Plaintiff further describes these products as "Medical Foods that are specially designed, produced and intended for use by infants or toddlers who suffer from a variety of diseases or disorders." *Id*. (citations omitted). All five products are labeled as having been manufactured in Liverpool, United Kingdom. *Id*. at Exs. 20A–20E.

MSUD Lophlex® LQ "is used as nutrition therapy for children who suffer from a severe, life threatening, and permanent disorder called branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency, (also called Maple Syrup Urine Disease or MSUD), an inborn error of the metabolism" that causes "impaired ability to

metabolize three of the twenty essential amino acids: leucine, valine and isoleucine." *Id*. at 6–7 (citations omitted).

Periflex® Infant and Periflex® Junior are produced for use by patients with Phenylketonuria (PKU), which is an "inborn error of metabolism of phenylalanine" that is "characterized by inadequate formation of L-tyrosine, elevation of serum L-phenylalanine, urinary excretion of phenylpyruvic acid and other derivatives, and accumulation of phenylalanine and its metabolites." *Id*. at 8 (citation omitted). The condition "can produce brain damage resulting in severe mental retardation, often with seizures, other neurologic abnormalities such as retarded myelination and deficient melanin formation leading to hypopigmentation of the skin and eczema." *Id*. (citation omitted).

Neocate® Junior is produced for use by patients who suffer from Eosinophilic Esophagitis (EoE), which is "an immune-mediated disease of the esophagus," *id.* at 10 (citation omitted), Short Bowel Syndrome (SBS), which "may occur when those portions of the small intestine have been removed or when portions of the small intestine are missing or damaged at birth," *id*. at 11 (citation omitted), and other diseases and disorders, *id*. at 10 (citations omitted).

Ketocal® Liquid is produced for use by patients who suffer from Intractable/Refractory Epilepsy, Glucose Transporter Type 1 Deficiency (GLUT 1), and other diseases and disorders. *Id*. at 12–13. GLUT 1 "is a lifelong genetic metabolic

disorder that occurs as a result of mutation in the SLC2A1 gene." *Id*. at 13 (citation omitted). "Persons with GLUT 1 demonstrate epilepsy, developmental delays, acquired microcephaly, cognitive impairment and varying degrees of spasticity, ataxia, and dystonia." *Id*. (citation omitted).

### C. Tariff Classification under the HTSUS

Tariff classification under the Harmonized Tariff Schedule of the United States ("HTSUS") is governed by the General Rules of Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of Interpretation ("ARIs"), both of which are contained in the statutory text of the HTSUS. *Dependable Packaging Solutions, Inc. v. United States*, 757 F.3d 1374, 1377 (Fed. Cir. 2014) (citations omitted) ("Along with the headings and subheadings . . . the HTSUS statute also contains the 'General Notes,' the 'General Rules of Interpretation' ('GRI'), the 'Additional United States Rules of Interpretation' ('ARI'), and various appendices for particular categories of goods.").

The GRIs are applied in numerical order, with GRI 1 providing, in pertinent part, that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. GRIs 2 through 5 apply "provided such headings or notes do not otherwise require." *Id.*

After determining the correct four-digit heading, the court determines the correct subheading by applying GRI 6, HTSUS (directing determination of the subheading

"according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to the above rules" [GRIs 1 through 5]).

### D. Judicial Review in Tariff Classification Disputes

In adjudicating a tariff classification dispute, the court first considers whether "the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) ("*Jarvis Clark*"). The plaintiff has the burden of showing that the government's classification of the subject merchandise was incorrect. *Id.*, 733 F.2d at 876. Subject to the plaintiff's rebuttal, factual determinations by Customs are presumed correct, *see* 28 U.S.C. § 2639(a)(1), but the presumption of correctness applies to issues of fact and not questions of law, *Goodman Mfg. L.P. v. United States*, 69 F.3d 505, 508 (Fed. Cir. 1995). If the plaintiff satisfies its burden of demonstrating that the government's classification was incorrect, the court must ascertain "the *correct* result, by whatever procedure is best suited to the case at hand." *Jarvis Clark*, 733 F.2d at 878 (footnote omitted).

In determining the correct classification, the court undertakes a two-step analysis. *Faus Grp., Inc. v. United States,* 581 F.3d 1369, 1371 (Fed. Cir. 2009). "The first step addresses the proper meaning of the relevant tariff provisions, which is a question of law." *Id.* (citation omitted). "The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed, which, when disputed, is a question of fact." *Id.* at 1371–72 (citation omitted).

"Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings." *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (quoting *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)). When interpreting tariff terms in the HTSUS, the court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Carl Zeiss*, 195 F.3d at 1379 (citing *Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999)).

The court also consults the Explanatory Notes ("ENs") for the Harmonized Commodity Description and Coding System ("Harmonized System" or "HS") maintained by the World Customs Organization. Although not legally binding, the Explanatory Notes "are generally indicative of the proper interpretation of a tariff provision." *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)). The HTSUS is organized according to Harmonized System rules and nomenclature (pursuant to the "Harmonized System Convention"). The Explanatory Notes are informative as to the intent of the drafters of the Harmonized System where, as in this case, the dispute involves a legal determination of the scope of the competing headings as determined under the GRIs.

**E. Claims of the Parties**

Upon liquidation, Customs classified Nutricia's imported products in subheading 2106.90.9998, HTSUS[2] ("Food preparations not elsewhere specified or included: Other: Other: Other: Other: Other: Other: Other: Other: Other: Other"), subject to duty at 6.4% *ad valorem*. Defendant maintains that this classification determination is correct.

Plaintiff claims classification of the products in subheading 3004.50.5040, HTSUS ("Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale: Other medicaments containing vitamins or other products of heading 2936: Other: Other: Other"), free of duty.

In the alternative, plaintiff claims classification of the products in a special U.S. duty-free tariff classification provision within chapter 98, HTSUS, specifically, subheading 9817.00.96 ("Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons; parts and accessories (except parts and accessories of braces and artificial limb prosthetics) that are specially designed or adapted for use in the foregoing articles: . . . Other").

[2] The products at issue were subject to the tariff provisions set forth in the version of the Harmonized Tariff Schedule of the United States ("HTSUS") that was in effect on the dates of entry. References to the HTSUS herein are to the 2014 version.

The court first determines the correct classification of the five products according to the GRIs and the tariff provisions in chapters 1 through 97, HTSUS. It then addresses the issue of whether these products qualify for the special classification provision plaintiff claims in the alternative.

**F. Application of GRI 1, HTSUS, to Determine the Appropriate Heading**

As required by GRI 1, HTSUS, the court first considers the terms of the headings and any relative section and chapter notes in ascertaining the correct four-digit heading for the classification of the imported products. The parties have identified the following candidate headings:

| | |
|---|---|
| Heading 2106, HTSUS: | "Food preparations not elsewhere specified or included" |
| Heading 3004, HTSUS: | "Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of mixed or unmixed products for therapeutic or prophylactic uses, put up in measured doses (including those in the form of transdermal administration systems) or in forms or packings for retail sale" |

The parties have not advocated, and the court has not identified, any other candidate headings within chapters 1 through 97, HTSUS.

**1. Classification under Heading 3004 Is Precluded by Note 1(a) to Chapter 30**

The terms of headings 3003 and 3004 are in parallel and similar in description, except that heading 3003 is limited to mixed products "*not* put up in measured doses or in forms or packings for retail sale," as follows:

Heading 3003, HTSUS: "Medicaments (excluding goods of heading 3002, 3005 or 3006) consisting of two or more constituents which have been mixed together for therapeutic or prophylactic uses, *not* put up in measured doses or in forms or packings for retail sale"

Heading 3003, HTSUS (emphasis added). Thus, the products of heading 3004, unless unmixed, would be classified under heading 3003 if imported in bulk form. Although the HTSUS does not define the heading term "medicament," the Explanatory Note to HS heading 30.03 states, in language equally applicable to heading 30.04, that "[t]his heading covers *medicinal preparations* for use in the internal or external treatment or prevention of human or animal ailments."[3] EN 30.03 (2014) (emphasis added).[4]

It could be argued that the products under consideration are medicaments because they are "for use in the internal . . . treatment . . . of human . . . ailments." *Id.*

---

[3] Similarly, dictionaries consider the term "medicament" synonymous with terms such as "medicinal substance" and "medication." As defendant points out, Webster's Third New International Dictionary and the Merriam-Webster Online Dictionary define "medication" as "a medicinal substance: MEDICAMENT." Def.'s Mem. in Supp. of its Cross-Mot. for Summary J. and Resp. in Opp'n to Pl.'s Mot. for Summary J. 14 (Oct. 28, 2022), ECFs No. 80 (Conf.), 81 (Public); *Medication*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002); *Medication*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/medication (last visited Dec. 4, 2023). The Oxford English Dictionary defines "medicament" as "a *substance used for medical treatment*; a medicine, remedy." *Medicament*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/medicament_n?tab=meaning_and_use#37536447 (last visited Dec. 4, 2023) (emphasis added).

[4] Citations to the Explanatory Notes of the Harmonized Commodity Description and Coding System are to the 2014 edition.

To that end, plaintiff maintains that "the subject products were conceived, designed, produced, marketed, and sold for 'therapeutic or prophylactic use' to treat persons with medical problems, which is the defining characteristic of a medicament." Pl.'s Br. 20. Plaintiff adds that "[m]edical professionals refer to the deployment of these products as 'nutritional **therapy**,' thus confirming their therapeutic use and value" and that "as FDA-regulated 'medical foods' the subject products are the 'medicine' that doctors will prescribe or recommend to treat children suffering from the referenced diseases." *Id*.

Nutricia argues that in order for defendant to prevail "it must demonstrate that the subject products are <u>not</u> medicaments" and that "[i]t cannot do so, because the tariff provisions, coupled with the record evidence, establish that the subject products are indeed medicaments." *Id*. The court does not agree with this analysis. Even if some definitions of the term "medicaments" were considered broad enough to encompass what plaintiff describes as "nutritional therapy" or "medical food" products, it would not follow that chapter 30, HTSUS necessarily includes these products. GRI 1 requires the court first to determine classification according to "any relative section and chapter notes," as well as the terms of the headings when interpreted according to intended meaning. GRI 1, HTSUS. To rule in favor of plaintiff's claim for classification under heading 3004, the court would need to agree with plaintiff's argument that its preferred classification under heading 3004 is not precluded by a pertinent chapter note, note 1(a) to chapter 30, HTSUS. But the court must reject that argument.

Note 1(a) to chapter 30, HTSUS expressly excludes from chapter 30, and therefore from heading 3004, "[f]oods or beverages (such as dietetic, diabetic or fortified foods, food supplements, tonic beverages and mineral waters), other than nutritional preparations for intravenous administration (section IV)." The reference to "section IV" indicates that the products described in the note, i.e., "foods . . . other than nutritional preparations for intravenous administration," are to be classified in section IV of the HTSUS, which includes chapter 21, rather than in section VI (which includes chapter 30).

In making an exception to the general exclusion that it applies to chapter 30, note 1(a) specifically references "*nutritional* preparations for intravenous administration." This term necessarily is interpreted to include nutritional preparations administered intravenously to treat or manage a medical condition, typically in a hospital or similar clinical setting. *See* EN 30.03 (specifying that the heading includes "[n]utritional preparations for intravenous administration only, i.e., by injection or drip into a vein."). The implication of this narrow exception to the general exclusion created by note 1(a) to chapter 30, HTSUS is that other "nutritional preparations," e.g., those formulated to be taken orally by persons with specific medical conditions, possibly are within that general exclusion.

Because Nutricia's imported products are not for intravenous administration, the question is whether these products are "foods or beverages" within the meaning of

those terms as used in note 1(a) to chapter 30, HTSUS. The note identifies "dietetic" and "diabetic" foods or beverages as an example of goods that are within the exclusion from chapter 30 created by note 1(a), connoting that even foods specialized for intended use by persons whose medical condition requires a specialized diet fall within the scope of that exclusion. In describing the products encompassed by that exclusion, the chapter note does not distinguish what plaintiff would call "medical foods" from other foods, except for the narrow class of goods comprised of nutritional preparations for intravenous administration.

The uncontested facts demonstrate that the note 1(a) exclusion to chapter 30 applies to the products at issue in this litigation. Plaintiff itself describes the five products as "Medical Foods, which are a unique class of products defined and regulated by the Food and Drug Administration under the Orphan Drug Act, 21 U.S.C. § 360ee." Pl.'s Br. 1. As plaintiff points out, § 360ee defines the term "Medical Food" as "[a] *food* which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation." *Id.* (quoting 21 U.S.C. § 360ee) (emphasis added).

The HS Explanatory Notes, which although not part of U.S. law are indicative of the intended meaning of heading terms and section and chapter notes, further indicate

that note 1(a) to chapter 30 precludes classification of Nutricia's products under heading 3004. The Explanatory Notes for headings 30.03 and 30.04, which are essentially identical, provide as follows:

> The provisions of the heading text do not apply to foodstuffs or beverages such as dietetic, diabetic or fortified foods, tonic beverages or mineral waters (natural or artificial), which fall to be classified **under their own appropriate headings**. This is essentially the case as regards food preparations containing only nutritional substances. The major nutritional substances in food are proteins, carbohydrates and fats. Vitamins and mineral salts also play a part in nutrition.
>
> Similarly foodstuffs and beverages containing medicinal substances are **excluded** from the heading if those substances are added solely to ensure a better dietetic balance, to increase the energy-giving or nutritional value of the product or to improve its flavour, always provided that the product retains its character of a foodstuff or a beverage.
>
> Moreover, products consisting of a mixture of plants or parts of plants or consisting of plants or parts of plants mixed with other substances, used for making herbal infusions or herbal "teas" (e.g., those having laxative, purgative, diuretic or carminative properties), and claimed to offer relief from ailments or contribute to general health and well-being, are also **excluded** from this heading (**heading 21.06**).
>
> Further, this heading **excludes** food supplements containing vitamins or mineral salts which are put up for the purpose of maintaining health or well-being but have no indication as to use for the prevention or treatment of any disease or ailment. These products which are usually in liquid form but may also be put up in powder or tablet form, are generally classified in **heading 21.06** or **Chapter 22**.
>
> On the other hand, the heading covers preparations in which the foodstuff or the beverage merely serves as a support, vehicle or sweetening agent for the medicinal substances (e.g., in order to facilitate ingestion).

EN 30.03, EN 30.04. These Explanatory Notes indicate that note 1(a) to chapter 30 was intended to draw a bright line between the medicaments of chapter 30 and the foods, including specialized foods taken orally by persons with medical needs (including, for example, diabetics), that are to be classified elsewhere in the HS nomenclature. Under the guidance provided by these ENs, a preparation in which "nutritional substances" are present only to support a "medicinal substance" (as described in the last paragraph quoted above) would be classified under HS heading 30.03 or 30.04. Such a product is to be distinguished from a product comprised entirely of nutritional substances (described in the first paragraph quoted above), or in which medicinal substances are present "solely to ensure a better dietetic balance" or "to increase the energy-giving or nutritional value of the product," EN 30.03, EN 30.04 (described in the second paragraph quoted above), which would not. According to this guidance, it is not sufficient for classification within heading 3003 or 3004, HTSUS that a preparation be formulated to treat or manage a medical condition: it must do so by administering a "medicinal substance." If, instead, the management of the condition is effected solely by a combination of "nutritional substances," the preparation is excluded from heading 3003 and 3004 (and from chapter 30 in the entirety) by note 1(a) to chapter 30, HTSUS. As shown by the uncontested facts, Nutricia's products fit that description.

Plaintiff acknowledges that the five products provide "*nutritional* therapy." Pl.'s Br. 28 (emphasis added). All of the ingredients in each of Nutricia's products

(described below) are "nutritional substances." Four of the products in question, "MSUD Lophlex® LQ," "Periflex® Infant," "Periflex® Junior," and "Neocate® Junior," treat one or more medical conditions by means of specially-formulated combinations of multiple amino acids and other ingredients, as described below. Proteins are included within the scope of the term "nutritional substances." *See, e.g.*, EN 30.04. Citing an expert witness report, plaintiff recognizes that "[p]roteins are essential to the growth and function of all living organisms, and are comprised of varying sequences of twenty different amino acids." Pl.'s Br. 5 (citing *Plaintiff's Expert Report of Dr. Jonah Essers* at 9 (May 27, 2022), Pl.'s Br. Ex. 1 ("*Essers Report*")). Plaintiff adds that "[h]umans source proteins (amino acids) by ingesting plant or animal-based foods." *Id*. The fifth product, Ketocal® Liquid, also contains amino acids and manages intractable or refractory epilepsy and Glucose Transporter Type 1 deficiency by providing "a 'ketogenic' diet that is high in fat, low in carbohydrates, and contains controlled proportions of protein." Pl.'s Br. 13 (citing Pl.'s Br. Ex. 5E, at 2).

Nutricia does not contend, and the report of its own expert witness would rebut an assertion that, amino acids are outside of the common and ordinary meaning of the term "nutritional substances." *See* Pl.'s Br. 5 (explaining that humans source amino acids "by ingesting plant or animal-based foods" and, citing *Essers Report* at 9, that "[p]roteins are essential to the growth and function of all living organisms"). The other

ingredients in each of the five products, described below, also are nutritional substances.

Plaintiff states that MSUD Lophlex® LQ contains a combination of 15 amino acids that does not include the "branch chain" amino acids ("BCAA"), which are leucine, valine, and isoleucine. Pl.'s Br. 7. Nutricia explains that BCAA, if present in the diet in more than minimal amounts, are toxic to children who have branched-chain alpha ketoacid dehydrogenase complex (BCKDC) deficiency (also called Maple Syrup Urine Disease or MSUD), an inborn error of the metabolism. *Id*. at 6–7 (citations omitted). The product is formulated to "provide the minimal amount of BCAA needed for life, without providing any excess that elicits toxicity." *Id*. at 8 (citing *Essers Report* at 10). Plaintiff adds that "[o]ther ingredients provided in the formula include: water, apple, grape, blackcurrent [*sic*] and elderberry juice concentrates, which are included to provide carbohydrates needed for energy and taste." *Id*. (citing *Essers Report* at 18 and Pl.'s Br. Ex. 7). Packaging for MSUD Lophlex® LQ, in 4.2-fluid-ounce "pouches," is labeled as "Mixed Berry Blast" and provides as follows:

> A leucine, isoleucine and valine-free, berry flavored ready-to-drink medical food containing mixed fruit juices from concentrate, amino acids, vitamins, trace elements, and some minerals. Contains docosahexaenoic acid (DHA). For the dietary management of proven Maple Syrup Urine Disease (MSUD) in individuals 4 years and older, including pregnant women (in conjunction with standard folic acid supplementation).

Pl.'s Br. Ex. 20A. The label also states: "Contains 44% fruit juice from concentrate and natural flavors."[5] *Id*.

Plaintiff states that Periflex® Infant and Periflex® Junior are used to treat infants and children, respectively, who have Phenylketonuria (PKU), "an inborn error of metabolism," the "prevailing treatment" for which "is a diet low or absent in foods that contain phenylalanine, which is a common amino acid, and the inclusion of certain supplements to provide the minimum amount of phenylalanine required for synthesis

---

[5] The ingredients of MSUD Lophlex® LQ are listed on the label as follows:

> **Ingredients**: Water, apple juice from concentrate (34.1%), grape juice from concentrate (6.9%), blackcurrant juice from concentrate (2.5%), L-lysine acetate, L-proline, citric acid, L-tyrosine, L-arginine, glycine, L-serine, L-aspartic acid, L-alanine, L-threonine, corn syrup solids, L-cystine, L-phenylalanine, dicalcium phosphate, L-histidine, elderberry juice from concentrate (0.6%), maltodextrin, magnesium acetate, N-acetyl L-methionine, L-tryptophan, choline bitartrate, C. cohnii oil*, sugar, microcrystalline cellulose, natural flavor, fruit concentrate (apple, blackcurrant, radish), L-ascorbic acid, taurine, guar gum, lecithin, xanthan gum, M-inositol, potassium sorbate (preservative), artificial sweetener: sucralose, ferrous lactate, artificial sweetener: acesulfame potassium, sodium benzoate (preservative), zinc sulfate, L-carnitine, niacinamide, DL-alpha tocopheryl acetate, calcium D-pantothenate, manganese sulfate, cupric sulfate, thiamine chloride hydrochloride, pyridoxine hydrochloride, vitamin A palmitate, riboflavin, folic acid, potassium iodide, ascorbyl palmitate, mixed tocopherols, sodium molybdate, D-biotin, sodium selenite, chromium chloride, phylloquinone, vitamin $D_3$, cyanocobalamin.
>
> *A source of docosahexaenoic acid (DHA)

Mem. of Law & Authorities in Supp. of Pl.'s Mot. for Summary J. Ex. 20A (Aug. 31, 2022), ECF Nos. 73 (Conf.), 74 (Public) ("Pl.'s Br.").

of body proteins." *Id*. at 8–9 (quoting Pl.'s Br. Ex. 9 and citing *Essers Report* at 11–12, 19–20, 24).

Periflex® Infant contains a combination of 17 amino acids that does not include phenylalanine and is not naturally found in foods. *Id*. at 9 (citing *Essers Report* at 19 and Pl.'s Br. Ex. 11). "Other ingredients in Periflex® Infant, include: essential vitamins, minerals, fats and carbohydrates."[6] *Id*. at 10 (citing *Essers Report* at 20 and Pl.'s Br. Ex. 11). Sample packaging in a 14-ounce canister is labeled as a powdered infant formula, as follows:

---

[6] The ingredients of Periflex® Infant are listed on the label as follows:

> **Ingredients**: Corn syrup solids, refined vegetable oil (high oleic sunflower, soy, coconut), calcium phosphate dibasic, L-arginine L-aspartate, tri-potassium citrate, L-leucine, L-lysine acetate, L-tyrosine, L-glutamine, L-proline, L-valine, glycine, L-isoleucine, CAEM (an emu[l]sifier), L-threonine, L-serine, L-histidine, L-alanine, sodium chloride, l-cystine, L-tryptophan, L-methionine, magnesium acetate, magnesium L-aspartate, potassium chloride, M. alpina oil*, choline bitartrate, M-inositol, C. cohnii oil**, L-ascorbic acid, ferrous sulfate, zinc sulfate, taurine, L-carnitine, niacinamide, sunflower oil, DL-alpha tocopherol acetate, calcium-d-pantothenate, cupric sulfate, manganese sulfate, pyridoxine hydrochloride, riboflavin, vitamin A acetate, thiamine chloride hydrochloride, ascorbyl palmitate, potassium iodide, chromium sulfate, mixed tocopherols, DL-alpha tocopherol, phylloquinone, sodium molybdate, folic acid, sodium hydrogen selenite, D-biotin, vitamin $D_3$, cyanocobalamin.
> 
> * A source of arachidonic acid(ARA)
> 
> ** A source of docosahexaenoic acid (DHA)

Pl.'s Br. Ex. 20B.

> Periflex Infant is a phenylalanine-free, iron-fortified infant formula containing a balance[d] mixture of other essential and non-essential amino acids, carbohydrate, fat, vitamins, minerals and trace elements. Periflex Infant also contains DHA and ARA, which are found in breast milk and are important for infant brain and eye development.

*Id*. at Ex. 20B. "Directions for Preparation and Use" instruct the consumer to "add five level scoops" to 5 fluid ounces of "warm or cool sterile water." *Id*.

Periflex® Junior contains a combination of 18 amino acids and also "essential vitamins, minerals, fats and carbohydrates."[7] *Id*. at 10 (citing *Essers Report* at 20–21 and Pl.'s Br. Ex. 14). Sample packaging in a 16-ounce canister is labeled as follows:

> **Periflex Junior** is a phenylalanine-free powder containing a balanced mixture of the other essential and non-essential amino acids, carbohydrate, fat, vitamins, minerals and trace elements. For the dietary management of phenylketonuria in toddlers and young children.

---

[7] The ingredients of Periflex® Junior are listed on the label as follows:

> **Ingredients**: Corn syrup solids, canola oil, high oleic safflower oil, L-glutamine, L-proline, L-asparagine, L-lysine hydrochloride, tripotassium citrate, L-tyrsoine, L-leucine, disodium hydrogen phosphate, L-valine, L-serine, L-isoleucine, tricalcium citrate, tricalcium phosphate, L-alanine, maltodextrin, L-threonine, sugar, magnesium hydrogen phosphate, L-citrulline, L-arginine, L-cystine, choline bitartrate, taurine, fractionated coconut oil, CAEM (an emulsifier), L-histidine, L-methoionine, L-tryptophan, L-ascorbic acid, M-inositol, ferrous sulfate, zinc sulfate, L-carnitine, DL-alpha tocopheryl acetate, manganese sulfate, niacinamide, calcium D-pantothenate, cupric sulfate, thiamine chloride hydrochloride, pyridoxine hydrochloride, riboflavin, vitamin A acetate, folic acid, potassium iodide, chromium chloride, sodium selenite, sodium molybdate, phylloquinone, D-biotin, vitamin $D_3$, cyanocobalamin.

Pl.'s Br. Ex. 20C.

*Id*. at Ex. 20C. The "Directions for Preparation and Use" inform the consumer that "[i]ntake is to be determined by a healthcare professional" and instruct the consumer to "add the prescribed amount of powder" according to specified dilution guidelines. *Id*.

Plaintiff's motion describes Neocate® Junior as a product "used to treat patients who suffer from: (1) Eosinophilic Esophagitis (EoE), (2) Short Bowel Syndrome (SBS), . . . as well as other diseases and disorders." *Id*. at 10 (citing *Essers Report* at 25–29). It contains a combination of 19 amino acids, "targeting the unique biology of a specific disease state." *Id*. at 12 (citing *Essers Report* at 20–21 and Pl.'s Br. Ex. 16). "Other ingredients in the formula include: essential vitamins, minerals, fats and carbohydrates."[8] *Id*. (citing *Essers Report* at 21 and Pl.'s Br. Ex. 16).

---

[8] The ingredients of Neocate® Junior are listed on the label as follows:

> **Ingredients**: Corn syrup solids (52%), refined vegetable oil (palm kernel and/or coconut oil (8%), canola oil (8%), high oleic safflower oil (8%)), L-arginine (2.4%), L-glutamine (2.3%), L-lysine L-aspartate (2%), and less than 2% of each of the following: tripotassium citrate, calcium phosphate dibasic, L-leucine, L-phenylalanine, L-proline, silicon dioxide, L-valine, glycine, L-isoleucine, N-acetyl-L-methionine, L-threonine, mono and diglycerides, sodium chloride, L-histidine, L-serine, L-alanine, magnesium acetate, calcium phosphate tribasic, choline bitartrate, L-tryptophan, L-tyrosine, diacetyl tartaric acid esters of mono & diglycerides, M-inositol, L-ascorbic acid, L-cystine, propylene glycol alginate, taurine, ferrous sulfate, L-carnitine, zinc sulfate, DL-alpha tocopheryl acetate, niacinamide, calcium D-pantothenate, magnesium sulfate, cupric sulfate, riboflavin, thiamine chloride hydrochloride, pyridoxine hydrochloride, vitamin A acetate, folic acid, potassium iodide,

(continued…)

A Neocate® Junior package, a 14.1-ounce canister, is labeled as follows:

> **Neocate Junior** provides complete or supplemental nutritional support for children with gastrointestinal impairment due to cow milk allergy or other medical conditions of the gastrointestinal tract.

*Id*. at Ex. 20D. The label also states:

> Amino Acid-Based Nutritionally Complete Powdered Formula
> Hypoallergenic
> For the dietary management of cow and soy milk allergy, multiple food protein intolerance, eosinophilic esophagitis, short bowel syndrome, and conditions of gastrointestinal tract impairment and malabsorption requiring an elemental diet
> A Medical Food
> Unflavored
> Powder – Add Water

*Id*. The "Directions for Preparation and Use" inform the consumer: "Suggested intake to be determined by a healthcare professional" and instruct the consumer to "add the prescribed amount of **Neocate Junior**" according to specified dilution guidelines. *Id*.

The fifth product, Ketocal® Liquid, "is unique in that it provides a 4:1 ratio of fat calories to 'non-fat' protein and carbohydrate calories." *Id*. at 13 (citing *Essers Report* at 21). It "is used to treat patients who suffer from: (1) Intractable/Refractory Epilepsy, [or] (2) Glucose Transporter Type 1 Deficiency (GLUT 1)" who require a "'ketogenic' diet that is high in fat, low in carbohydrates, and contains controlled proportions of

---

> chromium chloride, sodium molybdate, sodium selenite, phylloquinone, biotin, vitamin $D_3$, cyanocobalamin.

Pl.'s Br. Ex. 20D.

protein." *Id*. at 12–13 (citing Pl.'s Br. Ex. 5E, at 1–3). Plaintiff states that "[t]he fats in Ketocal® are: Refined vegetable oil (high oleic sunflower, soy, palm), alpina oil, C. Cohnii oil, mono and diglycerides, and soy lecithin" and that "[c]arnitine and taurine are added to further optimize digestion and metabolism." *Id*. at 13 (citing *Essers Report* at 21). "Other ingredients are: water, proteins, minimal carbohydrates, vitamins, minerals and fiber."[9] *Id*. at 14 (citing Pl.'s Br. Ex. 18).

---

[9] The ingredients of vanilla-flavored Ketocal® Liquid are listed on the label of outer packaging (containing 27 8-ounce individual containers) as follows:

> **Ingredients**: water, refined vegetable oil (high oleic sunflower, soy, palm), sodium caseinate (milk), whey protein concentrate (milk), soy fiber, corn starch, inulin, CAEM (an emulsifier), artificial flavor, dipotassium phosphate, gum arabic, calcium chloride, m. alpina oil*, magnesium acetate, potassium chloride, c. cohnii oil**, microcrystalline cellulose, sugar, fructooligosaccharide, L-ascorbic acid, calcium phosphate monobasic, mono and diglycerides, trisodium citrate, sodium hydroxide, choline chloride, L-cystine, calcium phosphate dibasic, artificial sweetener: sucralose, propylene glycol alginate, ferrous lactate, L-carnitine, taurine, M-inositol, L-tryptophan, zinc sulfate, DL-alpha tocopheryl, soy lecithin, niacinamide, calcium D-pantothenate, manganese sulfate, ascorbyl palmitate, cupric sulfate, thiamine chloride hydrochloride, pyridoxine hydrochloride, riboflavin, vitamin A acetate, mixed tocopherols, DL-alpha tocopherol, folic acid, potassium iodide, chromium chloride, sodium selenite, sodium molybdate, phylloquinone, D-biotin, vitamin $D_3$, cyanocobalamin.
>
> *A source of Arachidonic Acid (ARA)
> ** A source of docosahexaenoic acid (DHA)

Pl.'s Br. Ex. 20E. A package of unflavored Ketocal® Liquid is also illustrated. *Id.*

An 8-ounce package of the product is labeled as Ketocal® 4:1 LQ Multi Fiber and states: "A ready-to-feed 4:1 ratio ketogenic formula, for the dietary management of intractable epilepsy." *Id*. at Ex. 20E.

The descriptions and labeling of Nutricia's products demonstrate that each of these five products is comprised entirely of "nutritional substances." *See* EN 30.03, EN 30.04 (distinguishing between "nutritional substances" and "medicinal substances"). Note 1(a) to chapter 30, HTSUS, by plain meaning and as interpreted according to EN 30.03 and EN 30.04, excludes from chapter 30 all such products. GRI 1 requires the court to give effect to note 1(a) to chapter 30 and thereby exclude Nutricia's products from the scope of heading 3004, HTSUS.

Nutricia argues that note 1(a) to chapter 30, HTSUS does not defeat its claim for classification under heading 3004, essentially on the premise that this case presents a special situation under which chapter note 1(a) to chapter 30 must be disregarded. According to plaintiff's argument, the court should compare the heading the government advocates, heading 2106, HTSUS, with its preferred heading, heading 3004, HTSUS, and choose the latter based on the "relative specificity" of the two headings according to GRI 3(a), HTSUS ("The heading which provides the most specific description shall be preferred to headings providing a more general description."). By elevating GRI 3(a) over GRI 1, which takes precedence, this argument misinterprets the GRIs.

Plaintiff bases its argument on note 1(f) to chapter 21, HTSUS, which excludes from chapter 21 (and therefore from heading 2106) "products of heading 3003 or 3004." According to Nutricia's argument, "[t]he chapter 21 and 30 notes are mutually exclusive" and "[t]he [Court of Appeals for the] Federal Circuit has held that when there are two mutually exclusive chapter notes, the product must be classified according to the terms of the headings, GRI 1 and GRI 3(a), and the most specific provision prevails." Pl.'s Br. 37 (citing *Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246, 1252–53 (Fed. Cir. 2004) (citing *Sharp Microelectronics Tech., Inc. v. United States*, 122 F.3d 1446, 1450–51 (Fed. Cir. 1997))). *See also* Pl.'s Resp. to Def.'s Cross-Mot. for Summary J. and Reply to Def.'s Resp. to Pl.'s Mot. for Summary J. 17 (Dec. 2, 2022), ECF Nos. 86 (Conf.), 83 (Public) ("Pl.'s Resp.") ("Note 1(a) cannot be used to exclude products from chapter 30 in this case because Note 1(f) to chapter 21 excludes goods classified under heading 3004 from chapter 21.").

According to plaintiff, "when there are mutually exclusive chapter notes classification is first determined according to the relative specificity of the competing headings' text." *Id.* (quoting *Bauer Nike Hockey USA, Inc.*, 393 F.3d at 1252 n.6) ("Resorting to the exclusionary note before applying the rule of specificity . . . would yield the somewhat arbitrary result that the subject merchandise could be classified under different chapters based solely on which chapter the analysis began.").

Plaintiff's "relative specificity" argument is misguided in failing to give effect to GRI 1, which directs the inquiry to the terms of the headings and the relative section and chapter notes, with the section or chapter notes and the heading terms given equal consideration. A critical flaw in plaintiff's argument is that note 1(a) to chapter 30, which limits the scope of heading 3004 so as to exclude plaintiff's goods, and note 1(f) to chapter 21, which limits the scope of heading 2106, are not "mutually exclusive."

Note 1(a) to chapter 30, HTSUS excludes from that chapter a defined class or kind of goods: "[f]oods or beverages . . . other than nutritional preparations for intravenous administration." In contrast, note 1(f) to chapter 21, HTSUS, which states that chapter 21 "does not cover: . . . Yeast put up as a medicament or other products of heading 3003 or 3004," excludes by name one class or kind of goods (yeast put up as a medicament) but, as is pertinent here, also excludes the "products *of* heading 3003 or *3004*" (emphasis added). In doing so, note 1(f) to chapter 21, HTSUS requires a classification determination to be made *before* it can be decided *whether* the exclusion in note 1(f) to chapter 21 applies. Therefore, the court must consider the scope of heading 3004 as interpreted according to note 1(a) to chapter 30 as well as considering the effect, if any, of note 1(f) to chapter 21. When it does so, it must conclude that there is no occasion to apply note 1(f) to chapter 21 where, as here, a good is excluded from heading 3004 by operation of note 1(a) to chapter 30. In other words, because note 1(a) to chapter 30 precludes the court from considering heading 3004 as a candidate heading

for Nutricia's products, GRI 1 eliminates heading 3004 from consideration, and the issue of relative specificity of the competing headings, which is the subject of GRI 3(a), does not arise. The choice between heading 3004 and heading 2106 is determined conclusively by GRI 1, not GRI 3(a).

The problem addressed in *Bauer Nike Hockey USA, Inc.*, under which the "arbitrary result that the subject merchandise could be classified under different chapters based solely on which chapter the analysis began," 393 F.3d at 1252 n.6, is not presented by this case. The court has begun its analysis by first considering heading 3004, which is plaintiff's preferred alternative to the government's classification. But the same result would obtain were the court to consider heading 2106 in the first instance. Note 1(f) to chapter 21, HTSUS would require the court, in doing so, to decide whether Nutricia's products actually *are* products of heading 3004. The court must apply GRI 1 in making this determination, which entails giving effect to note 1(a) to chapter 30, under which heading 3004 is eliminated from consideration and there is no occasion to apply note 1(f) to chapter 21. The court, therefore, must reject the premise of plaintiff's argument, under which note 1(a) to chapter 30, HTSUS essentially is disregarded.

In support of its argument in favor of classification under heading 3004, plaintiff also argues that heading 3004 is a "use" provision (or "principal use" provision) and that the court, in determining the classification of the goods at issue, therefore must

apply additional U.S. rule of interpretation 1(a), HTSUS ("a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use."). Pl.'s Br. 29 (citations omitted). Plaintiff argues that "[e]ach of the products is used as nutrition therapy to treat young children with specific and dangerous medical conditions or disorders" and "have no other use." *Id*. at 30 (citation omitted). According to Nutricia's argument, the products at issue are of the same class or kind as medicaments and, accordingly, must be classified by operation of additional U.S. rule of interpretation 1(a) as medicaments under heading 3004, HTSUS. *Id*. (citations omitted).

Heading 3004 (like heading 3003) arguably contains language implicating use but is based on an *eo nomine* tariff term, "Medicaments . . . ." In any event, plaintiff's argument overlooks that in this instance there is no occasion to apply additional U.S. note of interpretation 1(a) (which applies only "[i]n the absence of special language or context which otherwise requires") because heading 3004 is precluded from consideration by GRI 1. GRI 1 requires the court to apply note 1(a) to chapter 30 to exclude Nutricia's imported products from chapter 30, HTSUS and, therefore, from heading 3004, HTSUS regardless of whether heading 3004 possibly could be considered to be a use provision.

**2. Heading 2106 Is the Correct Heading for Nutricia's Products**

Based on the uncontested facts as taken from the submissions of the parties in support of their cross-motions for summary judgment, there can be no genuine dispute over whether the five "medical foods" at issue in this case, being specially-formulated combinations of nutritional substances, are "food preparations." The next question, then, is whether any tariff provision excludes the products at issue from chapter 21, HTSUS, or specifically, from heading 2106, HTSUS. The court concludes there is not.

Note 1 to chapter 21 ("Miscellaneous edible preparations") excludes from the chapter certain foods and food preparations but does not exclude "medical foods" such as those at issue in this case. In addition, the Explanatory Note to HS heading 21.06 lists various classes or kinds of products covered by the heading and distinguishes from them some that are not covered. The EN provides as follows:

> Provided that they are not covered by any other heading of the Nomenclature, this heading covers:
>
> * * *
>
> (16) Preparations, often referred to as food supplements, based on extracts from plants, fruit concentrates, honey, fructose, etc. and containing added vitamins and sometimes minute quantities of iron compounds. These preparations are often put up in packagings with indications that they maintain general health or well-being. *Similar preparations, however, intended for the prevention or treatment of diseases or ailments are* ***excluded (heading 30.03 or 30.04)***.

EN 21.06 ¶ 16 (emphasis added). The issue presented by this EN is whether the reference in the third sentence to "[s]imilar preparations" could be read broadly to describe the products at issue in this case. Plaintiff argues that the court should

interpret the third sentence to apply to its medical food products, resulting in classification under heading 3004 rather than heading 2106, HTSUS. Pl.'s Br. 39. The court disagrees.

The paragraph quoted above from EN 21.06 addresses "food supplements" and "[s]imilar preparations." It must be read in context with HS note 1(a) to chapter 30 (and, accordingly, with note 1(a) to chapter 30, HTSUS), which expressly excludes all "food supplements" from chapter 30. Thus, food supplements fall within chapter 21, while certain products that are "similar" to food supplements (but are to be distinguished from food supplements) and are intended to treat a specific disease or ailment are "medicaments" or "medicinal substances" within the intended scope of HS heading 30.03 or 30.04. A food or beverage intended to treat a specific disease or ailment is not within that scope, unless it is based on a "medicinal substance" that, as instructed by EN 30.03 and EN 30.04, is not "added solely to ensure a better dietetic balance, to increase the energy-giving or nutritional value of the product or to improve its flavour." EN 30.03, EN 30.04.

As shown by the ingredient statements (presented above), each of the products at issue in this litigation is formulated from a large number of different nutritional substances but is not based on a "medicinal substance" as required for classification within heading 3003 or 3004, HTSUS. The implied premise of the argument Nutricia makes in reliance on EN 21.06 is that its imported products should not be considered to

be "foods" or "food supplements" within the meaning of note 1(a) to chapter 30, HTSUS. But the facts plaintiff itself puts forth in support of its summary judgment motion, discussed at length above, demonstrate that these are food products, comprised of nutritional substances, that note 1(a) to chapter 30, HTSUS excludes from that chapter.

In summary, the five products at issue are "food preparations" and are not "medicaments" of heading 3004, HTSUS. Because no other heading within chapters 1 to 97 of the HTSUS specifies or includes these food preparations, heading 2106 ("Other food preparations, not elsewhere specified or included") is the correct heading by operation of GRI 1.

**G. Application of GRI 6, HTSUS to Determine the Correct Subheading**

The products at issue are not "[p]rotein concentrates or textured protein substances" of subheading 2106.10, HTSUS and thus are classified in six-digit subheading 2106.90, HTSUS ("Other:"). The uncontested facts do not demonstrate that they are described by any of the eight-digit subheadings between 2106.90.03 and 2106.90.95, HTSUS, inclusive. Therefore, the correct eight-digit subheading is subheading 2106.90.99, HTSUS ("Food preparations not elsewhere specified or included: Other: Other: Other: Other: Other: Other), subject to duty at 6.4% *ad valorem*. This is the tariff classification Customs determined upon the liquidation of the entries

and the tariff classification defendant advocates in support of its cross-motion for summary judgment.

**H. Subheading 9817.00.96, HTSUS Does Not Apply to Nutricia's Products**

Plaintiff claims, in the alternative, that even if its products are not "medicaments" of heading 3004, HTSUS, they still would qualify for duty-free treatment under a special tariff provision, subheading 9817.00.96, HTSUS, which applies to "[a]rticles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons; parts and accessories (except parts and accessories of braces and artificial limb prosthetics) that are specially designed or adapted for use in the foregoing articles: . . . Other."

In support of its argument that the persons for whom its medical foods are produced are "physically or mentally handicapped persons," Nutricia directs the court's attention to U.S. note 4(a) to subchapter XVII, chapter 98, HTSUS, which defines the term "physically or mentally handicapped persons" as follows:

> For purposes of subheadings 9817.00.92, 9817.00.94 and 9817.00.96, the term "<u>blind or other physically or mentally handicapped persons</u>" includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working.

The court finds no merit in plaintiff's alternate classification claim. U.S. note 4(b) to subchapter XVII, chapter 98, HTSUS provides that subheading 9817.00.96 does not cover "(i) articles for acute or transient disability; (ii) spectacles, dentures, and cosmetic

articles for individuals not substantially disabled; (iii) therapeutic and diagnostic articles; or (iv) medicine or drugs." Plaintiff bases its argument on the premise that the persons for whom its medical foods are produced are "physically or mentally handicapped persons" and that these food products, even if not considered "medicine or drugs," nevertheless are not "therapeutic . . . articles" within the meaning of U.S. note 4(b)(iii) to subchapter XVII, chapter 98, HTSUS.

Defendant argues that the medical foods are "therapeutic" within the meaning of the note. Def.'s Br. 31. The undisputed facts provide some support for that argument. Plaintiff informs the court—and it is not contested—that the five products are "indicated for use in the treatment of a variety of diseases, predominantly in very young children," that "in some instances they are the only, or primary, available treatment to ameliorate these severe and sometimes fatal conditions" and that "[m]edical professionals refer to the deployment of these products as 'nutritional **therapy**,' thus confirming their therapeutic use and value." Pl.'s Br. 20.

Nevertheless, plaintiff urges the court to give the word "therapeutic" a different, and narrower, meaning when construing U.S. note 4(b)(iii) to subchapter XVII, chapter 98, HTSUS. According to Nutricia's argument, the word "therapeutic" as it appears in U.S. note 4(b) to subchapter XVII, chapter 98, HTSUS is confined to those articles that heal or cure a disability rather than treat or manage it. Pl.'s Resp. 34. Plaintiff argues that "U.S. note 4(a) and subheading 9817.00.96 were implemented as

part of the Educational, Scientific, and Cultural Materials Importation Act of 1982, which implemented the Nairobi Protocol" and that "[t]hese provisions were intended to liberally and broadly encourage the importation of articles for hand[ica]pped persons." *Id*. (citations omitted).

In support of its argument, Nutricia quotes *Richards Medical Co. v. United States*, 910 F.2d 828, 831 (Fed. Cir. 1990) ("Congress intended to encourage the importation of that merchandise which is designed to compensate for, or help adapt to, the handicapped condition. At the same time, Congress did not want to allow duty-free importation of merchandise which is used to heal or cure the condition causing the handicap."). Pl.'s Resp. 35. The facts of the case (decided under the previous Tariff Schedule of the United States but involving an antecedent provision to subheading 9817.00.96, HTSUS) are inapposite. The Court of Appeals for the Federal Circuit ("Court of Appeals") was considering whether the duty-free provision at issue applied to an imported hip prosthesis. The court recognized that the term "'therapeutic' has many different meanings and is subject to both broad and narrow interpretations." *Richards Medical Co.*, 910 F.2d at 830. Reading the term narrowly in light of the intent of the provision, the Court of Appeals affirmed a factual finding of the Court of International Trade in the decision being appealed, under which the prosthetic hip allowed a patient to "better compensate for the handicap" but did not cure the patient of an underlying condition, such as arthritis. Based on that finding, the Court of

Appeals concluded that the imported article was not "therapeutic" so as to preclude classification within the duty-free provision.

The flaw in plaintiff's alternate classification claim does not turn on whether the medical foods are other than "therapeutic," in the narrow sense of that term as urged upon the court by Nutricia. Instead, the error in plaintiff's classification analysis is its overly broad construction of the terms of the duty-free provision, considered on the whole. Read in conjunction with U.S. note 4(a) to subchapter XVII, chapter 98, HTSUS, the duty-free provision in subheading 9817.00.96 is limited to "[a]rticles specially designed or adapted for the use or benefit" of a "handicapped" person, i.e., "a person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working." Plaintiff interprets the terms "handicapped" and "physical or mental impairment" so broadly as to include virtually *any* serious medical condition, despite the words of limitation used to delineate the scope of the provision. Moreover, plaintiff interprets the term "[a]rticles specially designed or adapted for . . ." so broadly as to include "foods" or "beverages" designed to treat or manage (but not cure) such medical condition, provided they are not "medicines or drugs." The weakness in plaintiff's argument lies in its tortured interpretation of each of these terms, considered together and in context. Nothing in the terms of subheading 9817.00.96, HTSUS provides or

even connotes that Congress, addressing the needs of "the blind or other mentally or physically handicapped persons" for "articles specially designed or adapted" for their "use or benefit," intended the scope of the subheading to be so broad as to cover foods, food supplements, or nutritional substances or ingredients of any type.[10] The court, therefore, rejects plaintiff's alternate claim for classification of the five products in subheading 9817.00.96, HTSUS.

## III. CONCLUSION

The court concludes that there is no genuine dispute as to any material fact and that plaintiff has not demonstrated that "the government's classification is incorrect." *Jarvis Clark*, 733 F.2d at 876. Therefore, defendant is entitled to judgment as a matter of law. Accordingly, the court will deny plaintiff's motion for summary judgment, grant defendant's cross-motion, and enter summary judgment in favor of defendant.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: December 4, 2023
New York, New York

[10] Illustrative of the limited scope of the provision is the formulation of the related subheadings 9817.00.92 and 9817.00.96, HTSUS (which share the same general article description with subheading 9817.00.98) and are limited to physical articles ("Books, music, and pamphlets, in raised print" and "Braille tablets, cubarithms, and special apparatus, machines, presses, and types") as opposed to substances (e.g., liquids or powders) or foods. Under plaintiff's interpretation, for example, a food or food supplement specially designed to manage (but not cure) a severe visual impairment would qualify under the provision even though subheadings 9817.00.92 and 9817.00.96, HTSUS would not describe it.